Vik Pawar
**VIK PAWAR LAW PLLC**
6 South Street, Suite 201
Morristown, New Jersey 07960
Telephone: (212) 571-0805
Facsimile: (212) 571-0938
Email: vik@pawarlaw.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DORIS MEIER, derivatively on behalf of ELECTRIC LAST MILE SOLUTIONS, INC. f/k/a FORUM MERGER III CORPORATION, | Case No.: |
| Plaintiff, | |
| v. | |
| JAMES TAYLOR, JASON LUO, DAVID BORIS, MARSHALL KIEV, ALBERT LI, ROBERT SONG, STEVEN BERNS, NEIL GOLDBERG, RICHARD KATZMAN, BRIAN KRZANICH, JEFFREY NACHBOR, SHAUNA MCINTYRE, and RICHARD PERETZ, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| ELECTRIC LAST MILE SOLUTIONS, INC. f/k/a FORUM MERGER III CORPORATION, | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Doris Meier ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Electric Last Mile Solutions, Inc. f/k/a Forum Merger III Corporation ("ELM," "Forum," or the "Company"), files this Verified Shareholder Derivative

Complaint against Defendants James Taylor ("Taylor"), Jason Luo ("Luo"), David Boris ("Boris"), Marshall Kiev ("Kiev"), Albert Li ("Li"), Robert Song ("Song"), Shauna F. McIntyre ("McIntyre"), Brian M. Krzanich ("Krzanich"), Richard N. Peretz ("Peretz"), Neil Goldberg ("Goldberg"), Steven Berns ("Berns"), Richard Katzman ("Katzman"), Jeffrey Nachbor ("Nachbor") (collectively, the "Individual Defendants" and with the Company, "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of the Company, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; against Defendants Berns, Boris, Goldberg, Katzman, Kiev, and Nachbor (the "Forum Defendants") and Defendants Taylor and Luo for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); against Defendants Taylor, Luo, Boris, Kiev, Li, and Song for contribution under Sections 10(b) and 21D of the Exchange Act; and against Defendants Taylor, Luo, Li, and Song (the "ELMI  Defendants") for aiding and abetting the breaches of fiduciary by the Forum Defendants. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company and ELMI  (defined below), legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the controlling shareholder, directors, and officers of the Company and its operational predecessor from November 12, 2020 to February 1, 2022, both dates inclusive (the "Relevant Period").

2.     ELM is a nascent manufacturer of electric commercial vehicles headquartered in Troy, Michigan. Its business consists of designing, engineering, manufacturing, and customizing electric vehicles for the "last mile" of delivery. Its principal offerings include the Urban Delivery, a cargo van, and the Urban Utility, a cargo truck. The Company's functional predecessor Electric Last Mile, Inc. ("ELMI") was co-founded in August 2020 by Defendants Taylor and Luo.

3.     Before the merger that resulted in ELM, Forum was a special purpose acquisition company ("SPAC"), also known as a blank check company, created for the purpose of raising capital through an initial public offering and using the capital infusion to acquire an existing company. Forum was incorporated in Delaware on June 25, 2019 and completed its initial public offering on August 21, 2020 (the "IPO"), netting gross proceeds of $250 million.

4.     On December 11, 2020, Forum and ELMI announced that they had entered into an agreement to merge and certain ancillary agreements on December 10, 2020. Pursuant to the terms of the agreements, ELMI would merge with a subsidiary of Forum called ELMS Merger Corp. ("Merger Sub"), with ELMI surviving the merger and becoming a wholly owned subsidiary of Forum, which would rename itself Electric Last Mile Solutions, Inc.

5.     On June 25, 2021, ELMI, Merger Sub, and Forum consummated the anticipated business combination (the "Merger"), and the Company changed its name to Electric Last Mile Solutions, Inc.

6.      During the Relevant Period, the Individual Defendants made and/or caused the Company to false and misleading statements that misrepresented the financial condition of the Company and of ELMI and that concealed certain equity transactions involving ELMI that occurred prior to the announcement of the Merger.

7.      Specifically, during the Relevant Period, the Individual Defendants failed to disclose that in November 2020 and December 2020, certain ELMI executives had directly or indirectly purchased equity in ELMI at substantial discounts to market value without obtaining an independent valuation (collectively, the "Improper Equity Transactions"). Furthermore, the Individual Defendants failed to disclose that certain financial statements of ELMI and the Company were unreliable, that the Company would need to restate previously issued financial statements, and that the Company had initiated an investigation into, *inter alia*, the Improper Equity Transactions.

8.      The Individual Defendants' misrepresentations and the Improper Equity Transactions had the effect of misleading the investing public and artificially inflating the Company's stock during the Relevant Period.

9.      The truth emerged after markets closed on February 1, 2022, when the Company issued a press release revealing that Defendants Taylor and Luo had engaged in the Improper Equity Transactions, that the Company had created a special committee (the "Special Committee") of the Board of Directors (the "Board") to investigate the Improper Equity Transactions, and that the Company's financial statements needed to be restated and should no longer be relied upon. The Company also announced that, in connection with the Special Committee's investigation and related discussions, Defendant Taylor was resigning from his roles as Chief Executive Officer ("CEO") and director and Defendant Luo was resigning as Executive Chairman and as Chairman

of the Board.

10.     On this news, the price per share of the Company's common stock fell $2.88 per share, or approximately 51%, from closing at $5.59 per share on February 1, 2022, to close at $2.71 per share on February 2, 2022.

11.     After the truth emerged, the Company made a flurry of announcements detailing issues with its operations and explaining the extent of the fallout from the previously concealed misconduct. For instance, on February 14, 2022, the Company announced that BDO, LLP ("BDO") resigned on February 8, 2022 as the Company's independent registered public accounting firm for the fiscal year ended December 31, 2021. In the announcement, the Company detailed disagreements with BDO, including as related to BDO's compliance with certain independence requirements and BDO's (or one of its affiliate's) alleged role in the Improper Equity Transactions. Also on February 14, 2022, the Company announced that it had commenced a comprehensive review of the status of the Company's products and commercial plans. On March 4, 2022, the Company announced a planned reduction in force as part of a plan to focus on the Company's core business and streamline its cost structure, which reduction was later estimated to result in approximately $0.3 million in costs. On March 11, 2022, the Company announced, *inter alia*, revisions to previously disclosed vehicle delivery timetables.

12.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements and omissions about the financial status and business operations of the Company and its functional predecessor, ELMI. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make to the investing public certain false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that:

(1) certain of the Company's and ELMI's financial statements were false and unreliable; (2) certain ELMI executives and/or directors had engaged in the Improper Equity Transactions in which they purchased discounted equity without obtaining an independent valuation; (3) the Company had formed the Special Committee on November 25, 2021 to investigate the misconduct; and (4) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

13.     In further breach of their fiduciary duties to the Company, the Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact.

14.     The Forum Defendants breached their fiduciary duties to the Company by causing it to acquire ELMI on terms that were unfavorable to Company shareholders in light of issues at ELMI, including but not limited to the Improper Equity Transactions, the need for a reduction in force at ELMI to focus on ELMI's core business and streamline its cost structure, and the need for a comprehensive review of the status of ELMI's products and commercialization plan, issues which were then undisclosed (the "Overpayment Misconduct").

15.     The ELMI Defendants aided and abetted the breaches of fiduciary duty by the Forum Defendants due to their role in effecting the Merger, including by issuing false and misleading statements. Moreover, certain of the ELMI Defendants engaged in the Improper Equity Transactions which, *inter alia*, caused the Company's financial statements to be false and/or misleading.

16.     At all relevant times, the Individual Defendants further breached their fiduciary duties by causing the Company to fail to maintain effective disclosure controls and procedures and adequate internal controls.

17.     In light of the Individual Defendants' misconduct—which has subjected the Company, its former CEO, its former Executive Chairman, its two former Co-CEOs, its former Chief Financial Officer ("CFO"), and its current CFO to two federal securities fraud class action lawsuits pending in the United States District Court for the District of New Jersey (the "Securities Class Actions") and an investigation by the SEC, and which has further subjected the Company to the need to undertake intake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

18.     In light of the breaches of fiduciary duty by the Individual Defendants, five of whom constitute the entirety of the Company's current Board, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendant Boris' liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, the Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on the Company's behalf with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

23.     Plaintiff is a current shareholder of the Company. Plaintiff has continuously held Company common stock at all relevant times.

### Nominal Defendant ELM

24.     ELM a/k/a Electric Last Mile Solutions, Inc. and f/k/a Forum Merger III Corp. is a Delaware corporation with its principal executive offices at 1055 W. Square Lake Road, Troy, Michigan 48098. The Company's common stock trades on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "ELMS," and its warrants trade on the NASDAQ under the ticker symbol "ELMSW."

### Defendant Taylor

25.     Defendant Taylor co-founded ELMI in August 2020. He served as ELMI's CEO until the Merger, whereupon he continued as CEO of the merged Company until his resignation on February 1, 2022. He also served as the Company's President from August 10, 2021, until

February 1, 2022.

26.     On February 1, 2022, the Company announced that Defendant Taylor would serve as a Company consultant for a period of two years for an annual wage of $300,000. The Company further announced that Defendant Taylor would surrender 1.8 million shares of the Company's common stock to the Company and, no later than April 11, 2022, an additional number of shares of common stock with a value of approximately $3.3 million. On March 11, 2022, the Company filed a Form 8-K with the SEC stating that it had notified Defendant Taylor of its decision to terminate the consulting agreement, effective as of May 10, 2022.

27.     According to the Company's Form 8-K filed with the SEC on June 30, 2021 (the "Merger 8-K"), as of June 25, 2021, Defendant Taylor beneficially owned 5,305,598 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 25, 2021 was $10.19, Defendant Taylor owned approximately $54 million worth of Company stock at that time.

28.     According to the Company's definitive merger proxy statement filed on Schedule 14A with the SEC on June 9, 2021 (the "Merger Proxy Statement"), Defendant Taylor received an annual base salary of $480,000 as of the consummation of the Merger, and he was also entitled to customary employee benefits and an annual target bonus opportunity of 100% of base salary.

29.     The Merger Proxy Statement stated the following about Defendant Taylor:

***James Taylor.***   Mr. Taylor co-founded ELM in August 2020 and has served as ELM's Chief Executive Officer since its inception. Prior to co-founding ELM, Mr. Taylor served as Chief Executive Officer of SERES from May 2019 until August 2020. Prior to SERES, Mr. Taylor served as Chief Sales and Marketing Officer of Karma Automotive, LLC, a luxury electric car manufacturer, from April 2014 until December 2018. Prior to Karma Automotive, LLC, Mr. Taylor served as Chief Executive Officer of AMP Electric Vehicles, Inc. that acquired Workhorse Group Incorporated from March 2010 until September 2016. Prior to Workhouse Group Incorporated, Mr. Taylor served in positions of increasing responsibility at Dura Automotive Systems, LLC and General Motors Company

(including with General Motors' brands the Hummer and Cadillac).

**Defendant Luo**

30.     Defendant Luo co-founded ELMI in August 2020, and he currently serves as a limited observer on the to the Board. He served as ELMI's President and Executive Chairman until the Merger, whereupon he continued in those roles at the merged Company. On August 10, 2021, Defendant Taylor succeeded Defendant Luo as President of the Company and Defendant Luo was appointed to serve as the Company's Executive Chairman. On February 1, 2022, the Company announced that Defendant Luo was resigning from his positions as Executive Chairman and as Chair of the Board and would serve as a Company consultant and as a limited observer to the Board for a period of two years. The Company further announced that Defendant Luo would surrender 6.0 million shares of Company common stock, as well as an additional amount of cash and stock, at his option, totaling $10 million in value.

31.     According to the Merger 8-K, as of June 25, 2021, Defendant Luo beneficially owned approximately 59.3 million shares of the Company's common stock, representing 47.8% of the Company's outstanding common stock. This ownership, together with his positions at the Company, made him a controlling shareholder. Given that the price per share of the Company's common stock at the close of trading on June 25, 2021 was $10.19, Defendant Luo owned more than $604.1 million worth of Company stock at that time. In connection with his resignation, Defendant Luo agreed to surrender 6 million shares to the Company and pay an additional amount of cash and stock, at his option, totaling $10 million in value. Even assuming Defendant Luo elected to pay all of the $10 million in stock, his substantial holdings of Company common stock and his influence over the Board continue to make him a controlling shareholder of the Company.[1]

---

[1] According to his Form 4 filed with the SEC on December 2, 2021, Defendant Luo indirectly

32.     According to the Merger Proxy Statement, Defendant Luo received an annual base salary of $480,000 as of the consummation of the Merger, and he was also entitled to customary employee benefits and an annual target bonus opportunity of 100% of base salary.

33.     The Merger Proxy Statement stated the following about Defendant Luo:

***Jason Luo.***   Mr. Luo co-founded ELM in August 2020 and has served as ELM's Executive Chairman and President since its inception. In addition to co-founding ELM, Mr. Luo is a senior advisor and operating executive of Crestview Partners, a private equity firm focused on industrials, media and financial services. Prior to ELM and Crestview Partners, Mr. Luo was the interim CEO of Accuride Corporation, a manufacturer of wheels, wheel end and braking components for commercial and passenger vehicles, from January 2019 until June 2020. Prior to Accuride Corporation, Mr. Luo served as a Corporate Vice President of the Ford Motor Company and the Global Vice President, Chairman and Chief Executive Officer of Ford Greater China, a business unit of the Ford Motor Company, from August 2017 until January 2018 where he oversaw all operations for the 1.2 million vehicle business and the company's joint venture partnership with Changan Automobile. Prior to joining the Ford Motor Company, Mr. Luo served in positions of increasing responsibility at Key Safety Systems, Inc. from June 1997 until August 2017, and ultimately served as President, Chief Executive Officer and Vice Chairman of the Board of Directors. Mr. Luo currently serves on the board of directors of Accuride Corporation, Elo Touch Solutions, Inc., ATC Drivetrain Inc. and Sybridge Technologies, Inc.

**Defendant Boris**

34.     Defendant Boris served as Co-CEO, CFO, and as a director of Forum from its inception until the Merger, whereupon he stepped down from his roles as Co-CEO and CFO and continued serving as a director of the merged Company. Defendant Boris is a managing member of Forum Capital Management III LLC ("Forum Capital"), which is the managing member of Forum Investors III LLC ("Sponsor").  Defendant Boris is also a member of Sponsor. According to the Merger 8-K, as of June 25, 2021, Sponsor held nearly 6.9 million shares of the Company,

---

beneficially owned 59,490,342 shares of the Company's common stock. Thus, even after surrendering a minimum of six million shares in connection with his resignation—and perhaps more, depending on the method in which he elected to make the $10 million payment—Defendant Luo clearly retains holdings of tens of millions of shares of Company common stock.

or 5.5% following the Merger. Given that the price per share of the Company's common stock at the close of trading on June 25, 2021 was $10.19, Sponsor beneficially owned approximately $70 million worth of Company stock. Because of his role at Forum Capital, Defendant Boris is deemed to beneficially own the common stock held directly by Sponsor.

35.     According to the Merger Proxy Statement, Defendant Boris is entitled to an annual cash retainer of $100,000 and an annual grant of restricted stock units valued at $100,000 for his service as a director.

36.     The Merger Proxy Statement stated the following about Defendant Boris:

*David Boris.* Following the consummation of the business combination, Mr. Boris will serve as a Class I director of the post-combination board of directors. Currently, Mr. Boris serves as the Co-Chief Executive Officer, Chief Financial Officer and Director of the Company since inception. Mr. Boris serves as the Co-Chief Executive Officer, Chief Financial Officer and Director of Forum Merger IV Corporation since its inception. Mr. Boris served as the Co-Chief Executive Officer, Chief Financial Officer and Director of Forum Merger II Corporation from its inception in May 2018 until Forum Merger II Corporation's business combination with Tattooed Chef in October 2020. He served as Co-Chief Executive Officer, Chief Financial Officer and Director of Forum Merger Corporation from its inception in November 2016 until Forum Merger Corporation's business combination with ConvergeOne and served as a member of ConvergeOne's board of directors from the business combination until ConvergeOne's acquisition by CVC in January 2019 at $12.50 per share. He has over 30 years of Wall Street experience in mergers and corporate finance and has been involved in approximately 20 SPAC transactions as an advisor, investment banker and/or officer or board member, including ten business combinations totaling over $5.0 billion. Mr. Boris was a Director of Pacific Special Acquisition Corp. from July 2015 until August 2017. From November 2010 to May 2013, Mr. Boris served as Chairman of Primcogent Solutions LLC, leading the board during the period of the company's preparation to seek reorganization by way of a voluntary bankruptcy petition, which was filed in 2013. Mr. Boris served as Senior Managing Director and Head of Investment Banking at Pali Capital, Inc., an investment banking firm, from 2007. Mr. Boris served as President of Ladenburg Thalmann Group Inc. from 1999 to 2000, and was also Executive Vice President and Head of Investment Banking at Ladenburg Thalmann & Co. Inc. from 1998 to 2000. In addition, he was a co-founder, director, and a principal stockholder of Brenner Securities Corporation and its successors. Prior to Brenner, Mr. Boris was at Oppenheimer & Company Inc., as a Senior Vice President and Limited Partner. Mr. Boris began his career as a member of the Business Development Group of

W.R. Grace & Company, from 1984 to 1985. He is an active member of the Young Presidents' Organization, an organization with over 25,000 members who are in the top position of a qualifying company or division and are directly responsible for all operations of such business or division. Mr. Boris received a M.B.A. from Columbia University Business School and a B.A. from Vassar College, cum laude. We believe Mr. Boris is qualified to serve on the post-combination company board of directors based on his wide range of experience in capital market activities as well as his activities in special purpose acquisition companies and asset management, including his experience as an executive officer and director of Forum Merger Corporation, Forum Merger II Corporation, Forum Merger IV Corporation and the Company.

**Defendant Kiev**

37.     Defendant Kiev served as the Co-CEO, President, and as a director of Forum from its inception until the Merger. Defendant Kiev is a managing member of Forum Capital, which is the managing member of Sponsor, which held 5.5% of the Company following the Merger. Defendant Kiev is also a member of Sponsor. Because of his role at Forum Capital, Defendant Boris is deemed to beneficially own the common stock held directly by Sponsor which, as discussed in ¶ 34 supra, amounted to approximately $70 million worth of Company stock as of June 25, 2021. In addition to Sponsor's holdings, Defendant Kiev directly held 500,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 25, 2021 was $10.19, Defendant Kiev directly held approximately $5.1 million worth of Company stock.

38.     The Merger Proxy Statement stated the following about Defendant Kiev:

***Marshall Kiev***, 52, has been our Co-Chief Executive Officer, President and Director since inception. He has over 28 years of deal sourcing and principal investment experience in both family office and private equity settings. He has been the President and Founder of MK Capital Partners, a private investment firm, since 2016. The firm's primary investment strategies include direct private equity, growth equity and venture capital. Mr. Kiev was Co-Chief Executive Officer, President and Director of Forum Merger II Corporation until its business combination with Tattooed Chef, Inc. (Nasdaq: TTCF). Mr. Kiev was Co-Chief Executive Officer, President and Director of Forum Merger Corporation until its business combination with ConvergeOne (Nasdaq: CVON). Mr. Kiev was

previously a Director of Cohen Private Ventures, or CPV, from 2013 to 2016. CPV is a family office investing long-term capital in direct private investments and other opportunistic transactions. Prior to his position with CPV, Mr. Kiev was Chief of Staff at S.A.C. Capital Advisors, L.P., an investment firm, from 2010 to 2013. Prior to joining S.A.C., Mr. Kiev was President of Alternative Investments at Family Management Corporation, a multi-family office, from 2007 to 2009, where he oversaw a portfolio of investments in hedge funds and private equity funds. Previously, Mr. Kiev was a Partner at Main Street Resources, a middle-market private equity firm, from 2000 to 2007. He began his career in 1989 at Family Management Corporation where he held a variety of roles over more than a decade. Mr. Kiev is an active member of the Young Presidents' Organization. Mr. Kiev received an MBA degree from the Stern School of Business at New York University and a BA degree also from New York University. We believe Mr. Kiev is well-qualified to serve as a member of our board of directors due to his extensive financial experience, his asset management experience and his experience as an executive officer and director of Forum Merger Corporation and Forum Merger II Corporation.

**Defendant Li**

39.     Defendant Li served as ELMI's CFO and Treasurer from its inception in August 2020 until the Merger, whereupon he continued in that role until November 5, 2021, when he was succeeded by Defendant Song. He then remained with the Company as Vice President of Operational Finance until January 2, 2022, when he began serving the Company as a senior advisor. According to the Merger 8-K, as of June 25, 2021, Defendant Li beneficially owned nearly 110,088 million shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 25, 2021 was $10.19, Defendant Li owned over $1.1 million worth of Company stock.

40.     According to the Merger Proxy Statement, Defendant Li received an annual salary of $275,000 for his service as CFO and Treasurer of ELM.

41.     The Merger Proxy Statement stated the following about Defendant Li:

*Albert Li.*   Mr. Li has served as ELM's Chief Financial Officer and Treasurer since its inception in August 2020. Immediately prior to ELM, Mr. Li was retired from April 2019 until August 2020. Prior to entering retirement, Mr. Li served as the Chief Financial Officer at Future Mobility Corporation d/b/a Byton from

February 2017 until April 2019. Prior to Byton, Mr. Li was retired from September 2014 until February 2017. Mr. Li served as Corporate Vice President of Bombardier Inc. and General Manager of China from April 2012 until September 2014.

**Defendant Song**

42.     Defendant Song has served as the Company's CFO since November 5, 2021. From August 10, 2021 to November 5, 2021, he served as the Company's Treasurer, Principal Accounting Officer, Deputy Chief Financial Officer, and Controller. Additionally, he served as ELMI's Vice President of Finance and Controller beginning on April 26, 2021.

43.     According to a Form 8-K filed by the Company on November 10, 2021, Defendant Song receives an annual base salary of $375,000, and he is eligible to receive an annual target cash bonus equal to 75% of his annual base salary. On August 30, 2021, he received grants of 300,000 restricted stock units under the Company's 2020 Incentive Plan (the "Incentive Plan"), 250,000 time-vesting stock units, and 250,000 performance-vesting restricted stock units.

44.     The Company's Form 8-K filed with the SEC on November 11, 2021 stated the following about Defendant Song:

> Robert Song, age 39, has served as the Treasurer, Principal Accounting Officer, Deputy Chief Financial Officer, and Controller of the Company since August 10, 2021 and has served as the Vice President of Finance and Controller of Electric Last Mile, Inc., a wholly owned subsidiary of the Company ("ELM"), since April 26, 2021. Prior to joining ELM, he served as Chief Investment Officer of CorePoint Lodging Inc., a publicly traded U.S. lodging real estate investment trust, from March 2021 to April 2021. Mr. Song joined CorePoint in August 2018 as Senior Vice President of Investments and Finance. Prior to CorePoint, Mr. Song served as Principal for Alphabet Inc.'s Capital Markets and Corporate Finance team from October 2017 to August 2018. Prior to that, Mr. Song worked at Monogram Residential Trust, Inc., a publicly traded multifamily real estate investment trust, as Vice President of Finance and Capital Markets from 2016 to 2017, at Water Island Capital as an Investment Analyst from 2014 to 2016 and at Morgan Stanley from 2007 to 2014, most recently as Vice President of Investment Banking. In his previous positions, Mr. Song was responsible for the oversight of various finance and accounting functions. Mr. Song holds a Bachelor of Commerce (major in Actuarial Science) and a Master of Finance from Macquarie University in

15

Australia.

**Defendant Berns**

45.     Defendant Berns served as a director of Forum from its IPO until the Merger. In

addition, he is a member of Sponsor, which held 5.5% of the Company as of June 25, 2021.

46.     The Merger Proxy Statement stated the following about Defendant Berns:

***Steven Berns***, 55, is one of our directors as of the date hereof. Mr. Berns served as a director of Forum Merger II Corporation until the business combination with Tattooed Chef, Inc. Mr. Berns was the Chief Financial Officer of GTT Communications, Inc. (NYSE: GTT), a leading global cloud networking provider for multinational clients. Mr. Berns served as a director of Forum Merger Corporation. From September 2015 through July 2019, Mr. Berns served as the Co-Chief Operating Officer and Chief Financial Officer of Shutterstock, Inc. (NYSE: SSTK), a leading global provider of high-quality licensed photographs, vectors, illustrations, videos and music to businesses, marketing agencies and media organizations around the world. From July 2013 through August 2015, Mr. Berns served as Executive Vice President and Chief Financial Officer of Tribune Media (formerly Tribune Company), one of the country's leading multimedia companies, operating businesses in broadcasting, publishing and digital media. Prior to that time, Mr. Berns was the Executive Vice President and Chief Financial Officer of Revlon, Inc. (NYSE: REV), a worldwide cosmetics and beauty products company, from May 2009 to July 2013. Prior to that time, Mr. Berns was Chief Financial Officer of Tradeweb, LLC, a leading over-the-counter, multi-asset class online marketplace for securities trading and trade processing, from November 2007 until May 2009. From November 2005 until July 2007, Mr. Berns served as President, Chief Financial Officer and Director of MDC Partners Inc. (Nasdaq: MDCA) and from September 2004 to November 2005, Mr. Berns served as Vice Chairman and Executive Vice President of MDC Partners. Prior to that, Mr. Berns was the Senior Vice President and Treasurer of Interpublic Group of Companies, Inc., (NYSE: IPG) an organization of advertising agencies and marketing services companies from August 1999 until September 2004. Before that, Mr. Berns held a variety of positions in finance at Revlon, Inc. from April 1992 until August 1999, becoming Vice President and Treasurer in 1996. Prior to joining Revlon in 1992, Mr. Berns worked at Paramount Communications Inc. and at a predecessor public accounting firm of Deloitte & Touche. Mr. Berns has served on several boards including Shutterstock, Inc. (from 2012 to 2015 as Director and Chairman of the Audit Committee), LivePerson, Inc. (Nasdaq: LPSN from 2002 to 2011 as Director and Chairman of the Compensation Committee). Mr. Berns received a BS from Lehigh University and an MBA from the Stern School of Business at New York University. We believe Mr. Berns is well-qualified to serve as a member of the board due to his extensive experience in finance and operations and his experience as a director of Forum Merger Corporation and Forum Merger II Corporation.

**Defendant Goldberg**

47.     Defendant Goldberg served as a director of Forum from its IPO until the Merger, whereupon he began serving as a director of the merged Company. He currently serves as a member of the Audit Committee and the Compensation Committee. Defendant Goldberg is a member of Sponsor.

48.     According to the Merger Proxy Statement, Defendant Goldberg is entitled to an annual cash retainer of $100,000 and an annual grant of restricted stock units valued at $100,000 for his service as a director of ELM.

49.     The Merger Proxy Statement stated the following about Defendant Goldberg:

*Neil Goldberg.* Following the consummation of the business combination, Mr. Goldberg will serve as a Class I director of the post-combination board of directors. Currently he is one of the Company's directors. Mr. Goldberg served as a director of Forum Merger Corporation from initial public offering until the business combination with ConvergeOne. He has 45 years of retailing, merchandising, general management and real estate experience. Mr. Goldberg has served as Chairman and CEO of Raymour & Flannigan Furniture and Holdings, one of the largest furniture retailers in the United States, since 1972. He has led the growth of Raymour & Flannigan from three local stores to its current 130 locations across seven Northeast states employing more than 6,500 people. In addition, Mr. Goldberg has been active on numerous national industry boards including the National Home Furnishing Association, the Home Furnishing Council, the American Furniture Hall of Fame and FurnitureFan.com. He has also participated on the board of local and national charitable organizations including the HSBC Bank Regional Board, the Metropolitan Development Association, Say Yes to Education, the Salvation Army of Central New York and the Syracuse University School of Management. Mr. Goldberg has been honored for his work as a recipient of the Ernst and Young Entrepreneur of the Year, the City of Hope Spirit of Life Award and the Anti-Defamation League American Heritage Award. Mr. Goldberg received a B.S. in accounting from the Syracuse University School of Management. We believe Mr. Goldberg is qualified to serve on the post-combination company board of directors based on his experience in operations and real estate and his experience as a director of Forum Merger Corporation and the Company.

**Defendant Katzman**

50.     Defendant Katzman served as a director of Forum from its IPO until the Merger.

He is also a member of Sponsor.

51.    The Merger Proxy Statement stated the following about Defendant Katzman:

***Richard Katzman***, 62, is one of our directors as of the date hereof. Mr. Katzman served as a Director of Forum Merger I & II Corporations and is a private investor in early-stage companies and a member of the New York Angels investing group. He is also an Executive Director and board member of Noodle Education, a leading provider of online Masters programs and other education services, based in New York City. Mr. Katzman was previously a director of ConvergeOne. Mr. Katzman was Chairman & CEO of Kaz, Incorporated, a multinational consumer appliance company, until its sale in December 2010. Kaz's products include humidifiers, vaporizers, digital thermometers, hot/cold therapy, heaters, fans, and air cleaners. Under his leadership, the company grew from $4 million in annual sales to $500 million by expanding its product offerings, developing international distribution, and pioneering brand extension licensing with global power brands Vicks, Honeywell and Braun. Mr. Katzman also co-founded Terra Firma Software, a provider of enterprise solutions and an early developer of Macintosh applications. Mr. Katzman was a board member of Brown University's Entrepreneurship Program, the Executive in Residence for the first cohort of the IE-Brown Executive MBA program in 2011-12 and has been a judge in several business plan competitions. Mr. Katzman is on the NY board of Generation Citizen, which provides action civics curriculums to high schools. He was a board member of Princeton Review from its founding in 1982 until 2012 and was a trustee of Columbia Memorial Hospital in Hudson, NY. He is also a member of the Young Presidents' Organization. Mr. Katzman graduated with an A.B. from Brown University and attended the Singularity University Executive Program. We believe Mr. Katzman is well-qualified to serve as a member of the board due to his experience in finance and operations and his experience as a director of Forum Merger Corporation and Forum Merger II Corporation.

## Defendant Krzanich

52.    Defendant Krzanich has served as Chair of the Board since February 1, 2022. He has served as a Company director since the Merger. He currently serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee.

53.    According to the Merger Proxy Statement, Defendant Krzanich is entitled to an annual cash retainer of $100,000 and an annual grant of restricted stock units valued at $100,000 for his service as a director of ELM, as well as an additional $15,000 per year for his service as Chairman of the Board.

54.    The Merger Proxy Statement stated the following about Defendant Krzanich:

**_Brian M. Krzanich._**   Following the consummation of the business combination, Mr. Krzanich will serve as a Class III director of the post-combination board of directors. Currently, he has served as the President and Chief Executive Officer of CDK Global, Inc., an automotive retail software provider, since November 2018. Prior to CDK Global, Mr. Krzanich served as the Chief Executive Officer of Intel Corporation from 2013 until June 2018. Mr. Krzanich has served as a member of the Board of Directors of CDK Global, Inc. since November 2018, as a member of the supervisory board of AMS AG, a designer and manufacturer of advanced sensor solutions, since June 2019 and previously served on the Board of Directors of Deere & Company from 2016 to April 2018. Mr. Krzanich holds a bachelor's in engineering from San Jose State University. We believe Mr. Krzanich is qualified to serve on the post-combination company board of directors based on his significant senior leadership, operations, technology, and global strategic experience from his more than 36 years of service with Intel.

**Defendant McIntyre**

55.    Defendant McIntyre has served since February 1, 2022 as the Company's Interim CEO and principal executive officer. She served as a non-employee director of the Company from the time of the Merger until her appointment to the position of Interim CEO.

56.    In connection with her appointment as Interim CEO, Defendant McIntyre receives an annual base salary of $550,000 and a target bonus opportunity equal to 100% of her salary. In addition, she is entitled to receive an amount equal to $300,000 upon the expiration of the initial 90-day term of her employment.

57.    The Company's Form 8-K filed with the SEC on February 1, 2022 stated the following about Defendant McIntyre:

Shauna McIntyre, age 50, was the President, Automotive of Ouster, Inc. from October 2021 to January 2022. Prior to that, she served as the Chief Executive Officer of Sense Photonics, an automated LiDAR, from April 2020 until October 2021. Ms. McIntyre served as Program Lead and in other roles at Google Automotive Services from October 2016 to April 2020. Prior to that, she held integral roles at Google Automotive Services, Egon Zehnder International, Achates Power, Inc., Honeywell International, Inc., and Ford Motor Company. Ms. McIntyre serves on the Board of Directors for Lithia Motors, Inc. (NYSE: LAD), the Los Altos Educational Foundation and was also a co-founding board member

for the North American Council for Freight Efficiency. Ms. McIntyre holds a B.S. from the University of California, Los Angeles, an M.S. from the University of California, Berkeley, and an M.B.A. from Harvard.

**Defendant Nachbor**

58.     Defendant Nachbor served as a director of Forum from its IPO until the Merger. He is a member of Sponsor.

59.     The Merger Proxy Statement stated the following about Defendant Nachbor:

***Jeffrey Nachbor***, 54, is one of our directors as of the date hereof. Mr. Nachbor was a Director of Forum Merger II Corporation until the business combination with Tattooed Chef, Inc. Mr. Nachbor has served as ConvergeOne's Chief Financial Officer since September 2013. From 2008 until 2013, Mr. Nachbor served as Senior Vice President of Finance & Chief Accounting Officer of Leap Wireless International, Inc., a telecommunications company which was later acquired by AT&T Inc. From September 2005 to March 2008, Mr. Nachbor served as Senior Vice President and Corporate Controller of H&R Block, Inc. (NYSE: HRB). From February 2005 until August 2005, Mr. Nachbor served as Chief Financial Officer and Treasurer of Sharper Image Corporation, a consumer electronics retailer. From 2003 to 2005, Mr. Nachbor served as Senior Vice President and Corporate Controller of Staples, Inc., a business supplies and equipment retailer. Mr. Nachbor holds a B.A. in accounting from Old Dominion University, an M.B.A. from University of Kansas, and is a Certified Public Accountant. We believe Mr. Nachbor is well-qualified to serve as a member of the board due to his extensive experience in finance and operations.

**Defendant Peretz**

60.     Defendant Peretz has served as a Company director since the Merger. He currently serves as the Chair of the Audit Committee and the Compensation Committee.

61.     According to the Merger Proxy Statement, Defendant Peretz is entitled to an annual cash retainer of $100,000 and an annual grant of restricted stock units valued at $100,000 for his service as a director of ELM. In addition, he is entitled to cash retainers of $15,000 for his service as Chair of the Audit and Compensation Committees.

62.     The Merger Proxy Statement stated the following about Defendant Peretz:

***Richard N. Peretz.***   Following the consummation of the business combination,

Mr. Peretz will serve as a Class III director of the post-combination board of directors. Mr. Peretz recently retired as the Senior Vice President, Chief Financial Officer and Treasurer of the United Parcel Service in February 2020 and where he held that position since 2015. Prior to his promotion to Chief Financial Officer, Mr. Peretz served in positions of increasing responsibility at the United Parcel Service from 1981 until 2015. Mr. Peretz holds a BBA in accounting from the University of Texas at San Antonio and an M.B.A. from Emory University. We believe Mr. Peretz is qualified to serve on the post-combination company board of directors based on his valuable financial and leadership experience.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

63.    By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of the Company and because of their ability to control the Company's business and corporate affairs, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

64.    Each controlling shareholder, director, and officer owes the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

65.    The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors, and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

66.    To discharge their duties, the controlling shareholder, officers, and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

67.     Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholder, directors, and officers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the controlling shareholder, officers, and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of the Board at all relevant times.

68.     As the controlling shareholder, senior executive officers, and/or directors of a publicly-traded company whose common stock and warrants were registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

69.     To discharge their duties, the Company's controlling shareholder, officers, and directors were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the Company's controlling shareholder, officers, and directors were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to the Company's own Code of Ethics and Business Conduct (the "Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements

made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

70.     Each of the Individual Defendants further owed to the Company and the shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

71.     At all times relevant hereto, the Individual Defendants were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

72.     Because of their advisory, executive, managerial, directorial, and controlling positions with the Company, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

73.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

74.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

75.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

76.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of the Company was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

77.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been

aware of their overall contribution to and furtherance of the wrongdoing.

78.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of such agency.

## **COMPANY'S CODE OF ETHICS AND CORPORATE GOVERNANCE**

### *ELM's Code of Ethics*

79.     The Code of Ethics, in its "Introduction," states that the Board adopted the Code of Ethics in order to:

> (a)     promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest;

> (b)     promote full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company;

> (c)     promote compliance with applicable governmental laws, rules, and regulations;

> (d)     promote the protection of Company assets, including corporate opportunities and confidential information;

> (e)     promote fair dealing practices;

> (f)     deter wrongdoing; and

> (g)     ensure accountability for adherence to the Code.

80.     Moreover, the Code of Ethics states that "[a]ll directors, officers and employees are required to be familiar with the Code, comply with its provisions and report any suspected violations[.]"

81.     With regard to conflicts of interest, the Code of Ethics states that "[c]onflicts of interest should be avoided unless specifically authorized[.]"

82.     With regard to "Compliance," the Code of Ethics provides that:

4.1     Directors, officers, and employees should comply, both in letter and spirit, with all applicable laws, rules, and regulations in the cities, states, and countries in which the Company operates.

4.2     Although not all directors, officers, and employees are expected to know the details of all applicable laws, rules, and regulations, it is important to know enough to determine when to seek advice from appropriate personnel. Questions about compliance should be addressed to the General Counsel or a Company legal advisor.

4.3     No director, officer, or employee may purchase or sell any Company securities while in possession of material nonpublic information regarding the Company, nor may any director, officer, or employee purchase or sell another company's securities while in possession of material nonpublic information regarding that company. It is against Company policies and illegal for any director, officer, or employee to use material nonpublic information regarding the Company or any other company to:

(a) obtain profit for himself or herself; or

(b) directly or indirectly "tip" others who might make an investment decision on the basis of that information.

83.     Regarding "Disclosure," the Code of Ethics states as follows:

5.1     The Company's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC rules.

5.2     Each director, officer, and employee who contributes in any way to the preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained. Each director, officer, and employee must cooperate fully with the Company's accounting and internal audit departments, as well as the Company's independent public accountants and counsel.

5.3     Each director, officer, and employee who is involved in the Company's disclosure process must:

(a)     be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and

(b)     take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely, and understandable disclosure.

84.     The Code of Ethics also provides that "[a]ctions prohibited by this Code involving directors or executive officers must be reported to the Audit Committee."

### *ELM's Audit Committee Charter*

85.     ELM's Audit Committee Charter states that one of the Audit Committee's purposes is to assist the Board in the oversight over the Company's "accounting and financial reporting process and the audits of the Company's financial statements."

86.     The Audit Committee Charter also describes the Audit Committee's responsibility to review and discuss with management and the independent auditor, *inter alia*: (1) "major issues regarding accounting principles and financial statement presentations"; and (2) "major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies."

### *Forum's Audit Committee Charter*

87.     Forum's Audit Committee Charter, filed on August 16, 2020 as an exhibit to Forum's last amended registration statement prior to the IPO, states that the purpose of Forum's Audit Committee was "to assist the Board in its oversight of the accounting and financial reporting processes of the Company and the Company's compliance with legal and regulatory requirements."

88.     Forum's Audit Committee Charter also stated that the Forum Audit Committee shall

> oversee: (i) audits of the financial statements of the Company; (ii) the integrity of the Company's financial statements; (iii) the Company's processes relating to risk management and the conduct and systems of internal control over financial reporting and disclosure controls and procedures; (iv) the qualifications, engagement, compensation, independence and performance of the Company's independent auditor, and the auditor's conduct of the annual audit of the Company's financial statements and any other services provided to the Company; and (v) the performance of the Company's internal audit function, if any[.]"

89.     The Forum Audit Committee Charter further enumerated certain "key responsibilities," of the Forum Audit Committee, including, *inter alia*, the following:

(i)      ***Quality and Integrity of Financial Statements.*** The Committee shall review and discuss with management and the independent auditor: the critical accounting policies and practices used by the Company, and any significant changes in the selection or application of the Company's accounting and auditing principles and practices as suggested by the Company's independent auditor, internal auditors, if any, or management; the accounting treatment to be applied in respect of significant new transactions or other significant events not in the ordinary course of the Company's business; other policies and procedures adopted by the Company to fulfill its responsibilities regarding the presentation of financial statements in accordance with GAAP and applicable rules and regulations of the SEC, including the proper explanation and reconciliation of any non-GAAP measures presented; and any issues that arise with respect to the quality or integrity of the Company's financial statements.

(ii)     ***Audited Financial Statements.*** The Committee shall review and discuss with management and the independent auditor, before the issuance of the audit report, the financial statements and related notes and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" proposed to be included in the Company's Annual Report on Form 10-K. In this connection, the Committee shall review and discuss with management and the independent auditor the analyses prepared by management setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements (including analyses of the effects of alternative GAAP methods on the financial statements), and such other matters for which discussion shall be required by applicable auditing and related PCAOB standards. The Committee shall make a recommendation to the Board as to whether such financial statements should be included in the Company's Annual Report on Form 10-K.

\*               \*               \*

(iv)     ***Quarterly Financial Statements.*** The Committee shall review and discuss with management and the independent auditor the quarterly financial statements and related notes and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" proposed to be included in the Company's Quarterly Reports on Form 10-Q, together with the analyses prepared by management setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, and such other matters for which discussion shall be required by applicable auditing standards and related PCAOB standards.

90.     The Forum Audit Committee Charter further provides that the Forum Audit

Committee is tasked with oversight of controls and procedures as follows: "***Oversight.*** The Committee shall provide oversight of management's design and maintenance of the Company's internal control over financial reporting and disclosure controls and procedures."

91.     The Individual Defendants violated the Code of Ethics, Company policy, and the Company's corporate governance documents by engaging in or permitting the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and failing to report the same. Further in violation of the Code of Ethics and the Company's policies, the Individual Defendants failed to maintain internal controls, failed to maintain the accuracy of Company records and reports, and failed to comply with applicable laws and regulations.

92.     In violation of ELM's Audit Committee Charter, Defendants Peretz (as Chair), Boris, Goldberg, and Krzanich (the "Audit Committee Defendants") conducted little, if any, oversight of ELM's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of ELM's Audit Committee Charter, the Audit Committee Defendants failed to adequately oversee of major issues regarding the Company's accounting principles and financial statement presentations and major issues related to the adequacy of the Company's internal controls, including the Company's internal control over financial reporting and disclosure controls and procedures.

93.     In violation of the Forum Audit Committee Charter, Defendants Berns (as Chair), Goldberg, and Katzman conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Forum Audit Committee Charter, Defendants Berns, Goldberg, and Katzman failed to ensure the quality and integrity of Forum's financial statements, including in Forum's quarterly reports. Furthermore, Defendants Berns, Goldberg, and Katzman failed to exercise oversight over the Company's internal control over financial reporting and disclosure controls and procedures.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

94.     ELM is a Delaware corporation based in Troy, Michigan that seeks to engineer, manufacture, and customize electric "last mile" delivery and utility vehicles. ELM in its current form results from the combination of ELMI, which was founded in August 2020 by Defendants Luo and Taylor, and Forum, a SPAC that had its IPO in that same month.

95.     On August 21, 2020, Forum consummated its IPO. In the IPO, Forum offered 25 million units, which consisted of one share of Class A common stock and one-third of one redeemable warrant of the Company, with each warrant entitling the holder to purchase one share of Class A common stock for $11.50 per share. The units were sold at a price of $10 per unit, generating gross proceeds to Forum of $250 million. Simultaneously with the consummation of the IPO, the Company completed the sale of 741,250 private placement units, of which 616,250 were sold to Sponsor and 125,000 were sold to the IPO underwriters, all at a purchase price of $10

per unit.

96.     In August and September 2020, Defendant Luo founded and funded ELMI by causing ELMI to issue 1,000 shares of common stock to Defendant Luo's entity, AJ Capital, Inc., at $10 per share. Defendant Taylor co-founded ELMI.

97.     Discussions concerning a potential business combination began on August 21, 2020 between senior members of ELMI and Defendants Kiev and Boris, who were Forum's Co-CEOs. On September 18, 2020, Forum, on the one hand, and ELMI and Defendants Luo and Taylor, on the other hand, executed a letter of intent for a proposed business combination between Forum and ELMI, estimating the total enterprise value ascribed to the combined company at $1.3 billion. At that time, Defendant Luo owned, through AJ Capital, Inc., 100% of the issued shares of ELMI.

98.     On December 11, 2020, Forum and ELMI announced they had entered into an agreement to merge, pursuant to which Merger Sub, a wholly-owned subsidiary of Forum, would merge into and with ELMI, with ELMI surviving the Merger.

99.     The Merger between ELMI, Merger Sub, and Forum was consummated on June 25, 2021, upon which time Forum changed its name to Electric Last Mile Solutions, Inc. and each ELMI share was exchanged for approximately 800 shares of ELM.

100.     The Individual Defendants failed to cause the Company to maintain adequate internal control over financial reporting and effective disclosure controls and procedures, as evidenced by false and misleading statements issued during the Relevant Period. Moreover, certain of the Individual Defendants caused the Company to engage in the Overpayment Misconduct by acquiring ELMI on terms that were unfair to Forum shareholders in light of the undisclosed Improper Equity Transactions and other undisclosed issues with ELMI. The ELMI Defendants aided and abetted the breaches of fiduciary duty by the Forum Defendants, including by causing

the Company to issue false and misleading financial statements pertaining to ELMI.

**The Improper Equity Transactions**

101.    In November and December 2020, shortly before the announcement of the Merger, certain ELMI executives purchased equity in ELMI at substantial discounts to market value without obtaining an independent valuation. These executives included at least Defendant Taylor and Defendant Luo, each of whom was aware of discussions pertaining to the eventual Merger of ELMI and Forum prior to engaging in the Improper Equity Transactions.

102.    According to the Company's Form 8-K filed with the SEC on February 1, 2022, on November 19, 2020, ELMI issued and sold 99,000 shares of its common stock for $990,000 to seven investors (the "November 2020 Equity Transaction"). Those seven investors included an entity affiliated with Defendant Taylor, called The JET Group, LLC, which purchased 6,461 shares of ELMI common stock at $10 per share for a total of $64,610, and two entities affiliated with Defendant Luo, which purchased 78,016 shares of ELMI common stock at $10 per share for a total of $780,160. Specifically, the 78,016 shares purchased by entities affiliated with Defendant Luo consisted of 20,000 shares of ELMI common stock purchased by Luo Pan Investment II, LLC for $200,000, and 58,016 shares of ELMI common stock purchased by AJ Capital Investment, LLC for $580,160.

103.    On December 8, 2020, Defendant Luo through AJ Capital, Inc. sold 1,000 shares of ELMI common stock for $10 per share for a total of $10,000 directly or indirectly to other members of senior management (the "December 2020 Equity Transaction").

104.    As the Company has stated in its SEC filings, ELMI "does not appear to have obtained an independent valuation to determine the fair market value per share of its common stock as of or contemporaneous with the date of those transactions." The Company has stated that,

because Defendant Taylor "may have been seen as providing services to ELMI at the time he participated in the November 2020 Equity Transaction," the Company is evaluating whether ELMI should have treated as compensation to Defendant Taylor any difference between the fair market value of shares sold by ELMI to The Jet Group, LLC and the $10 per share Defendant Taylor paid or caused to be paid. Similarly, the Company is evaluating "whether a compensation expense should have been recorded and taxes paid in connection with the December 2020 Equity Transaction."

105.    When the Merger was announced on December 11, 2020, the Company disclosed an implied equity value for the combined company of approximately $1.4 billion. When the Merger was consummated on June 25, 2021, each share of ELMI, for which executives had paid $10 per share in the Improper Equity Transactions, was exchanged for approximately 800 shares of New ELM. As the price of ELM common stock closed at $10.19 on June 25, 2021, the day the Merger was consummated, 800 shares of ELM were worth $8,152 upon the consummation of the Merger. Thus, each share of ELMI stock purchased by ELMI executives in the Improper Equity Transactions for $10.00 became worth $8,152 upon the consummation of the Merger. As Defendant Taylor, through The Jet Group, purchased 6,461 shares for $64,610, those shares became worth $52,670,072, for a gain of $52,605,462. As Defendant Luo, through two entities, purchased 78,016 shares of ELMI for $780,160, those shares became worth $635,986,432, for a gain of $635,206,272.

106.    Although the price of the Company's stock was artificially inflated on June 25, 2021, the date the Merger was consummated, Defendant Taylor's and Defendant Luo's acquisitions in the November 2020 Equity Transaction resulted in enormous gains on their investments, even when adjusted to reflect the true value of the share price. During the Relevant

Period, the Company's share price was only worth $2.71 per share, the price of closing on February 2, 2022, when the truth had emerged. Given that shares of ELMI were exchanged for approximately 800 shares of ELM upon the consummation of the Merger, Taylor's holdings of 6,461 shares of ELMI represented 5,168,800 shares of ELM upon the consummation of the Merger. Because these shares were then worth $2.71 per share, the closing price on February 2, 2022, Defendant Taylor's investment of $64,610 resulted in holdings of approximately $14,007,448, a gain of approximately $13.9 million. Defendant Luo's holdings of 78,016 shares of ELMI represented approximately 64,412,800 shares of ELM upon the consummation of the Merger. Because these shares were then worth $2.71 per share, the closing price on February 2, 2022, Defendant Luo's investment of $780,160 resulted in holdings of approximately $169,138,688, a gain of approximately $168.4 million.

107.    The Company did not recognize any compensation associated with Defendant Taylor's participation in the November 2020 Equity Transaction, or in connection with the December 2020 Equity Transaction. Furthermore, the Company did disclose any compensation associated with those transactions; or withhold or pay taxes in connection with that compensation.

108.    In its Form 8-K filed with the SEC on February 1, 2022, the Company stated that it had undertaken an assessment of the accuracy of its historical financial statements and related disclosures and "expects to determine that material weaknesses exist in the Company's internal control over financial reporting and that disclosure controls and procedures were ineffective during the Non-Reliance Period," a reference to the previously issued consolidated financial statements of ELMI and the Company's financial statements in certain quarterly reports.

109.    Certain of the Individual Defendants, including and especially Defendants Taylor and Luo, engaged in the Improper Equity Transactions. Their engagement in the Improper Equity

Transactions aided and abetted the breaches of fiduciary duty by the Forum Defendants. Furthermore, the Individual Defendants, individually and collectively, breached their fiduciary duties to the Company by failing to disclose the Improper Equity Transactions, as discussed further below.

**Overpayment Misconduct**

110.   As discussed above, prior to the Merger, certain ELMI executives engaged in the Improper Equity Transactions, including at least Defendant Taylor and Defendant Luo. However, the Company did not recognize any compensation associated with Defendant Taylor's participation in the Improper Equity Transactions. In addition, ELMI suffered from the need for a reduction in force to focus ELMI on its core business and streamline its cost structure, as well as the need for a comprehensive review of the status of its products and commercial plan. The Board Board would only undertake the workforce reduction and comprehensive review after the resignations of Defendants Taylor and Luo.

111.   In light of issues at ELMI, which were then undisclosed, the Forum Defendants breached their fiduciary duties to the Company by causing Forum to merge with ELMI on terms that were unfavorable to the Company and its shareholders.

112.   According to the Company's Form 8-K filed with the SEC on December 11, 2020, the consideration for the Merger consisted of the following:

> The aggregate consideration payable to the stockholders of ELMI at the closing of the Business Combination (the "Closing") is $1,300,000,000, payable solely in shares of Forum common stock, par value $0.0001 per share ("Common Stock"), valued at $10.00 per share, subject to the purchase price adjustments and deductions as set forth in the Merger Agreement *less* $292,000,000, the value of the 29,200,000 shares of Common Stock reserved for a new long-term equity incentive plan ($150,000,000 of which are restricted share units with vesting terms substantially similar to the Earnout Shares (as defined below)), *less* $2,500,000, the value of the Adjustment Escrow Stock (as defined below), and *less* $50,000,000, the value of the Earnout Shares (the "Closing Merger Consideration").

In addition, an aggregate of 5,000,000 shares of Common Stock (the "Earnout Shares") will be placed into escrow at Closing and will be payable to ELMI stockholders (the "ELMI Stockholders") during the 36-month period following the Closing (the "Earnout Period") as follows: (i) if the closing price of the Common Stock (the "Closing Price") equals or exceeds $14.00 on any 20 trading days in any 30-consecutive-day trading period, then 2,500,000 Earnout Shares will be released from escrow to the ELMI Stockholders, and (ii) if the Closing Price equals or exceeds $16.00 on any 20 trading days in any 30-consecutive-day trading period, then the remaining 2,500,000 Earnout Shares will be released from escrow to the ELMI Stockholders. Subject to the terms and conditions set forth in the Merger Agreement, if a qualifying Change in Control (as defined in the Merger Agreement) occurs during the Earnout Period, all Earnout Shares not previously released will be released to the ELMI Stockholders. Any Earnout Shares not released prior to the expiration of the Earnout Period will be forfeited and cancelled.

113.    As a result of the Merger, ELMI stockholders saw each share of their holdings of ELMI stock—at least some of which were purchased for $10.00—converted into approximately 800 shares of ELM, the value of which closed at $10.19 on the day the Merger was consummated. In Forum's IPO, Company stockholders purchased units for $10 that consisted of one share of Company Class A common stock and one-third of one redeemable warrant of the Company, with each warrant entitling the holder to purchase one share of Class A common stock for $11.50 per share. The profound difference between how ELMI insiders acquired and converted ELMI stock and the manner in which the investing public purchased Company stock in the IPO demonstrates the unfairness of the consideration paid in the Merger. Following the consummation of the Merger, the former security holders of Forum beneficially owned merely a fifth of the Company, or approximately 21.1% of the outstanding shares of Company common stock.

114.    The Forum Defendants were in a position to know that ELMI executives had engaged in the Improper Equity Transactions in the course of conducting due diligence, as well as the negative implications for the financial statements published in the Company's filings with the SEC. Furthermore, the Forum Defendants were in a position to know of the true state of affairs

with respect to ELMI's products and commercial plans and as well as inefficiencies in the ELMI's workforce that prevented ELMI from focusing on its core business and from having a streamlined cost structure. Despite this knowledge, the Forum Defendants caused Forum to acquire ELMI on terms that were unreasonable given the foregoing issues with ELMI.

115.    The Forum Defendants had interests in the Merger that diverged from the interests of Forum stockholders. For instance, each of the Forum Defendants was a member of Sponsor. Like Defendants Taylor and Luo, who had engaged in the Improper Equity Transactions and stood to reap a windfall through the Merger, Sponsor paid $25,000 for certain founder shares of the Company which, if unrestricted and freely tradeable would have been valued at approximately $62 million based on the closing price of Forum Class A common stock on March 31, 2021. Furthermore, Sponsor paid over $6.1 million for private placement units that would have become worthless if Forum did not consummate a business combination by August 21, 2022.

116.    In breach of their fiduciary duties to the Company, the Forum Defendants placed their own interests over the interests of Forum and Company shareholders, and agreed to the Merger on less favorable terms than were reasonable, given the Improper Equity Transactions, the need for a reduction in force at ELMI to focus on its business and streamline its cost structure, and the need for a comprehensive review of the status of ELMI's products and commercialization plan, defects which would only later become publicly known.

**False and Misleading Statements Made During the Relevant Period**

*November 12, 2020 10-Q*

117.    On November 12, 2020, the Company filed its quarterly report with the SEC for the period ended September 30, 2020 (the "3Q20 10-Q"). The 3Q20 10-Q was signed by Defendants Kiev and Boris and contained certifications, signed by Defendants Kiev and Boris,

pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements contained in the 3Q20 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

118.    The 3Q20 10-Q contained the following financial statements:

FORUM MERGER III CORPORATION
CONDENSED BALANCE SHEETS

| | September 30, 2020 (unaudited) | | December 31, 2019 (audited) | |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets | | | | |
| Cash | $ | 1,814,904 | $ | 19,810 |
| Prepaid expenses | | 191,275 | | — |
| Total Current Assets | | 2,006,179 | | 19,810 |
| Deferred offering costs | | — | | 62,726 |
| Cash and marketable securities held in Trust Account | | 250,022,847 | | — |
| **Total Assets** | $ | 252,029,026 | $ | 82,536 |
| | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities | | | | |
| Accrued expenses | $ | 37,955 | $ | 1,966 |
| Accrued offering costs | | — | | 57,726 |
| Due to Sponsor | | 94,110 | | — |
| Total Current Liabilities | | 132,065 | | 59,692 |
| Deferred underwriting fee payable | | 8,750,000 | | — |
| **Total Liabilities** | | 8,882,065 | | — |
| | | | | |
| Commitments and Contingencies | | | | |
| Class A common stock subject to possible redemption, 23,814,696 and none shares at redemption value as of September 30, 2020 and December 31, 2019, respectively | | 238,146,960 | | — |
| | | | | |
| **Stockholders' Equity** | | | | |
| Preferred stock, $0.0001 par value; 1,000,000 shares authorized; none issued and outstanding | | — | | — |
| Class A common stock, $0.0001 par value; 100,000,000 shares authorized; 1,926,554 and none issued and outstanding (excluding 23,814,696 and none shares subject to possible redemption) as of September 30, 2020 and December 31, 2019, respectively | | 193 | | — |
| Class B common stock, $0.0001 par value; 10,000,000 shares authorized; 7,187,500 shares issued and outstanding as of September 30, 2020 and December 31, 2019 [(1)] | | 719 | | 719 |
| Additional paid-in capital | | 5,104,360 | | 24,281 |
| Accumulated deficit | | (105,271) | | (2,156) |
| **Total Stockholders' Equity** | | 5,000,001 | | 22,844 |
| **Total Liabilities and Stockholders' Equity** | $ | 252,029,026 | $ | 82,536 |

*March 31, 2021 10-K*

119.    On March 31, 2021, the Company filed its annual report with the SEC on Form 10-K for the fiscal year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K was signed by Defendants Kiev, Boris, Goldberg, Katzman, Berns, and Nachbor, and contained SOX certifications, signed by Defendants Kiev and Boris attesting to the accuracy of the financial statements contained in the 2020 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

120.    The 2020 10-K contained the following financial statements:

**FORUM MERGER III CORPORATION**
**CONSOLIDATED BALANCE SHEETS**

| | December 31 | |
| --- | --- | --- |
| | 2020 | 2019 |
| **ASSETS** | | |
| Current assets | | |
| Cash | $ 1,555,497 | $ 19,810 |
| Prepaid expenses | 157,486 | — |
| Total Current Assets | 1,712,983 | 19,810 |
| | | |
| Deferred offering costs | — | 62,726 |
| Cash and marketable securities held in Trust Account | 250,066,590 | — |
| **TOTAL ASSETS** | $ 251,779,573 | $ 82,536 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities | | |
| Accrued expenses | $ 3,329,929 | $ 1,966 |
| Accrued offering costs | — | 57,726 |
| Total Current Liabilities | 3,329,929 | 59,692 |
| | | |
| Deferred underwriting fee payable | 8,750,000 | — |
| **TOTAL LIABILITIES** | 12,079,929 | 59,692 |
| | | |
| **Commitments and Contingencies** | | |
| | | |
| Class A common stock subject to possible redemption, 23,469,964 and none shares at redemption value as of December 31, 2020 | 234,699,640 | — |
| | | |
| **Stockholders' Equity** | | |
| Preferred stock, $0.0001 par value; 1,000,000 shares authorized, none issued and outstanding | — | — |
| Class A common stock, $0.0001 par value; 100,000,000 shares authorized; 2,271,286 and none issued and outstanding (excluding 23,469,964 and none shares subject to possible redemption) as of December 31, 2020 and 2019, respectively | 227 | — |
| Class B common stock, $0.0001 par value; 10,000,000 shares authorized; 6,250,000 and 7,187,500 shares issued and outstanding as of December 31, 2020 and 2019, respectively [1] | 625 | 719 |
| Additional paid-in capital | 8,551,740 | 24,281 |
| Accumulated deficit | (3,552,588) | (2,156) |
| **Total Stockholders' Equity** | 5,000,004 | 22,844 |
| **Total Liabilities and Stockholders' Equity** | $ 251,779,573 | $ 82,536 |

[1] At December 31, 2019, the shares issued and outstanding include 937,500 shares of Class B common stock forfeited on October 5, 2020 as a result of the expiration of the underwriter's option to exercise their over-allotment (see Note 5).

---

**FORUM MERGER III CORPORATION**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Year Ended December 31, 2020 | For the Period from June 25, 2019 (Inception) Through December 31, 2019 |
| --- | --- | --- |
| Formation and operational costs | $ 3,617,022 | $ 2,156 |
| **Loss from operations** | (3,617,022) | (2,156) |
| | | |
| Other income: | | |
| Interest earned on marketable securities held in Trust Account | 66,590 | — |
| | | |
| **Net loss** | $ (3,550,432) | $ (2,156) |
| | | |
| Weighted average shares outstanding of Class A redeemable common stock | 25,000,000 | — |
| **Basic and diluted net income per share, Class A** | $ 0.00 | $ 0.00 |
| | | |
| Weighted average shares outstanding of Class A and Class B non-redeemable common stock [1] | 6,518,068 | 6,250,000 |
| **Basic and diluted net loss per share, Class A and Class B non-redeemable common stock** | $ (0.54) | $ (0.00) |

[1] At December 31, 2019, the weighted average shares outstanding include up to 937,500 shares of Class B common stock forfeited on October 5, 2020 as a result of the expiration of the underwriter's option to exercise their over-allotment (see Note 5).

**FORUM MERGER III CORPORATION**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Stock Subscription Receivable from Stockholder | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | $ | $ | $ | $ |
| Balance – June 25, 2019 | — | $ — | — | $ — | $ — | $ — | $ — | $ — |
| Issuance of Class B common stock to Sponsor [(1)] | — | — | 7,187,500 | 719 | 24,281 | (25,000) | — | — |
| Collection of stock subscription receivable from stockholder | — | — | — | — | — | 25,000 | — | 25,000 |
| Net loss | — | — | — | — | — | — | (2,156) | (2,156) |
| Balance – December 31, 2019 | — | — | 7,187,500 | 719 | 24,281 | — | (2,156) | 22,844 |
| Sale of 25,000,000 Units, net of underwriting discounts | 25,000,000 | 2,500 | — | — | 235,812,232 | — | — | 235,814,732 |
| Sale of 741,250 Private Placement Units | 741,250 | 74 | — | — | 7,412,426 | — | — | 7,412,500 |
| Forfeiture of Founder Shares | — | — | (937,500) | (94) | 94 | — | — | — |
| Class A common stock subject to possible redemption | (23,469,964) | (2,347) | — | — | (234,697,293) | — | — | (234,699,640) |
| Net loss | — | — | — | — | — | — | (3,550,432) | (3,550,432) |
| Balance – December 31, 2020 | 2,271,286 | $ 227 | 6,250,000 | $ 625 | $ 8,551,740 | $ — | $ (3,552,588) | $ 5,000,004 |

(1) Includes 937,500 shares of Class B common stock forfeited on October 5, 2020 as a result of the expiration of the underwriter's option to exercise their over-allotment (see Note 5).

**FORUM MERGER III CORPORATION**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Year Ended December 31, 2020 | For the Period from June 25, 2019 (Inception) Through December 31, 2019 |
|---|---|---|
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (3,550,432) | $ (2,156) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Interest earned on marketable securities held in Trust Account | (66,590) | — |
| Changes in operating assets and liabilities: | | |
| Prepaid expenses | (157,486) | — |
| Accrued expenses | 3,327,963 | 1,966 |
| Net cash used in operating activities | (446,545) | (190) |
| **Cash Flows from Investing Activities:** | | |
| Investment of cash into Trust Account | (250,000,000) | — |
| Net cash used in investing activities | (250,000,000) | — |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from issuance of Class B common stock to Sponsor | — | 25,000 |
| Proceeds from sale of Units, net of underwriting discounts paid | 245,000,000 | — |
| Proceeds from sale of Private Placement Units | 7,412,500 | — |
| Proceeds from promissory note – related party | 40,000 | — |
| Repayment of promissory note – related party | (40,000) | — |
| Payment of offering costs | (430,268) | (5,000) |
| Net cash provided by financing activities | 251,982,232 | 20,000 |
| **Net Change in Cash** | 1,535,687 | 19,810 |
| Cash – Beginning of period | 19,810 | — |
| Cash – End of period | $ 1,555,497 | $ 19,810 |
| **Non-cash investing and financing activities:** | | |
| Offering costs included in accrued offering costs | $ — | $ 57,726 |
| Initial classification of Class A common stock subject to possible redemption | $ 238,249,360 | $ — |
| Change in value of Class A common stock subject to possible redemption | $ (3,549,720) | $ — |
| Deferred underwriting fee payable | $ 8,750,000 | $ — |

*May 7, 2021 Form 10-K/A*

121.    On May 7, 2021, the Company filed a Form 10-K/A with the SEC, amended the

2020 10-K (the "2020 10-K/A"). The 2020 10-K/A was signed by Defendants Kiev, Boris, Goldberg, Katzman, Berns, and Nachbor and contained SOX certifications signed by Defendants Kiev and Boris attesting to the accuracy of the financial statements contained in the 2020 10-K/A, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

122.    The 2020 10-K/A contained the following financial statements:

**FORUM MERGER III CORPORATION**
**CONSOLIDATED BALANCE SHEETS**

| | December 31 | |
| --- | --- | --- |
| | **2020** | **2019** |
| | (As Restated) | |
| **ASSETS** | | |
| Current assets | | |
| Cash | $ 1,555,497 | $ 19,810 |
| Prepaid expenses | 157,486 | — |
| Total Current Assets | 1,712,983 | 19,810 |
| Deferred offering costs | — | 62,726 |
| Cash and marketable securities held in Trust Account | 250,066,590 | — |
| **TOTAL ASSETS** | $ 251,779,573 | $ 82,536 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities | | |
| Accrued expenses | $ 3,329,929 | $ 1,966 |
| Accrued offering costs | — | 57,726 |
| Total Current Liabilities | 3,329,929 | 59,692 |
| Deferred underwriting fee payable | 8,750,000 | — |
| Warrant liabilities | 29,859,848 | |
| **TOTAL LIABILITIES** | 41,939,777 | 59,692 |
| | | |
| **Commitments and Contingencies** | | |
| | | |
| Class A common stock subject to possible redemption, 20,483,979 and none shares at redemption value as of December 31, 2020 | 204,839,790 | — |
| | | |
| **Stockholders' Equity** | | |
| Preferred stock, $0.0001 par value; 1,000,000 shares authorized, none issued and outstanding | — | — |
| Class A common stock, $0.0001 par value; 100,000,000 shares authorized; 5,257,271 and none issued and outstanding (excluding 20,483,979 and none shares subject to possible redemption) as of December 31, 2020 and 2019, respectively | 526 | — |
| Class B common stock, $0.0001 par value; 10,000,000 shares authorized; 6,250,000 and 7,187,500 shares issued and outstanding as of December 31, 2020 and 2019, respectively [1] | 625 | 719 |
| Additional paid-in capital | 34,362,236 | 24,281 |
| Accumulated deficit | (29,363,381) | (2,156) |
| **Total Stockholders' Equity** | 5,000,006 | 22,844 |
| **Total Liabilities and Stockholders' Equity** | $ 251,779,573 | $ 82,536 |

(1)  At December 31, 2019, the shares issued and outstanding includes 937,500 shares of Class B common stock forfeited on October 5, 2020 as a result of the expiration of the underwriter's option to exercise their over-allotment (see Note 6).

**FORUM MERGER III CORPORATION**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Stock Subscription Receivable from Stockholder | Accumulated Deficit | Total Stockholders' Equity |
| | Shares | Amount | Shares | Amount | | | | |
|---|---|---|---|---|---|---|---|---|
| Balance – June 25, 2019 | — | $ — | — | $ — | $ — | $ — | $ — | $ — |
| Issuance of Class B common stock to Sponsor [1] | — | — | 7,187,500 | 719 | 24,281 | (25,000) | — | — |
| Collection of stock subscription receivable from stockholder | — | — | — | — | — | 25,000 | — | 25,000 |
| Net loss | — | — | — | — | — | — | (2,156) | (2,156) |
| Balance – December 31, 2019 | — | — | 7,187,500 | 719 | 24,281 | — | (2,156) | 22,844 |
| Sale of 25,000,000 Units, net of underwriting discounts and public warrant liabilities | 25,000,000 | 2,500 | — | — | 231,881,777 | — | — | 231,884,277 |
| Sale of 741,250 Private Placement Units, net of private placement warrant liabilities | 741,250 | 74 | — | — | 7,293,826 | — | — | 7,293,900 |
| Forfeiture of Founder Shares | — | — | (937,500) | (94) | 94 | — | — | — |
| Class A common stock subject to possible redemption | (20,483,979) | (2,048) | — | — | (204,837,742) | — | — | (204,839,790) |
| Net loss | — | — | — | — | — | — | (29,361,225) | (29,361,225) |
| Balance – December 31, 2020 (As Restated) | 5,257,271 | $ 526 | 6,250,000 | $ 625 | $ 34,362,236 | $ — | $ (29,363,381) | $ 5,000,006 |

(1)  Includes 937,500 shares of Class B common stock forfeited on October 5, 2020 as a result of the expiration of the underwriter's option to exercise their over-allotment (see Note 6).

### *May 26, 2021 Form 10-Q*

123.    On May 26, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2021 (the "1Q21 10-Q").  The 1Q21 10-Q was signed by Defendants Kiev and Boris and contained SOX certifications signed by Defendants Kiev and Boris attesting to the accuracy of the financial statements contained in the 1Q21 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

124.    The 1Q21 10-Q contained the following financial statements:

**FORUM MERGER III CORPORATION**
**CONDENSED CONSOLIDATED BALANCE SHEETS**

| | March 31, 2021 (Unaudited) | | December 31, 2020 | |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets | | | | |
| Cash | $ | 1,038,353 | $ | 1,555,497 |
| Prepaid expenses | | 174,124 | | 157,486 |
| Total Current Assets | | 1,212,477 | | 1,712,983 |
| | | | | |
| Cash and marketable securities held in Trust Account | | 250,004,042 | | 250,066,590 |
| **Total Assets** | $ | 251,216,519 | $ | 251,779,573 |
| | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities - Accounts payable and accrued expenses | $ | 3,815,030 | $ | 3,329,929 |
| Deferred underwriting fee payable | | 8,750,000 | | 8,750,000 |
| Warrant liabilities | | 16,325,028 | | 29,859,848 |
| **Total Liabilities** | | 28,890,058 | | 41,939,777 |
| | | | | |
| **Commitments and Contingencies** | | | | |
| | | | | |
| Class A common stock subject to possible redemption, 21,732,646 and 20,483,979 shares at redemption value as of March 31, 2021 and December 31, 2020, respectively | | 217,326,460 | | 204,839,790 |
| | | | | |
| **Stockholders' Equity** | | | | |
| Preferred stock, $0.0001 par value; 1,000,000 shares authorized; none issued or outstanding | | — | | — |
| Class A common stock, $0.0001 par value; 100,000,000 shares authorized; 4,008,604 and 5,257,271 issued and outstanding (excluding 21,732,646 and 20,483,979, none shares subject to possible redemption) as of March 31, 2021 and December 31, 2020, respectively | | 401 | | 526 |
| Class B common stock, $0.0001 par value; 10,000,000 shares authorized; 6,250,000 shares issued and outstanding as of March 31, 2021 and December 31, 2020 | | 625 | | 625 |
| Additional paid-in capital | | 21,875,691 | | 34,362,236 |
| Accumulated deficit | | (16,876,716) | | (29,363,381) |
| **Total Stockholders' Equity** | | 5,000,001 | | 5,000,006 |
| **Total Liabilities and Stockholders' Equity** | $ | 251,216,519 | $ | 251,779,573 |

### *June 9, 2021 Proxy Statement*

125.    On June 9, 2021, the Company filed the Merger Proxy Statement with the SEC. Defendants Kiev, Boris, Goldberg, Katzman, Berns, and Nachbor solicited the Merger Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions. Moreover, according to the Company's Form 8-K filed on December 11, 2020 with the SEC, "ELMI and its directors and executive officers may also be deemed to be participants in the solicitation of proxies from the stockholders of Forum in connection with the [Merger]." Thus, the Merger Proxy Statement was also solicited by, at least, Defendants Taylor and Luo.

126.    The Merger Proxy Statement called for Company shareholders to, *inter alia*: (1) approve the Merger; (2) approve the issuance of more than 20% of the Company's issued and outstanding common stock in connection with the Merger, including to ELMI securityholders and to SF Motors Inc. d/b/a SERES ("SERES"); (3) approve the Company's third amended and

restated certificate of incorporation; (4) approve on a non-binding advisory basis certain differences between the Company's second amended and restated certificate of incorporation and the proposed third amended and restated certificate of incorporation; (5) to approve a new long-term equity incentive plan (the "Incentive Plan"); and (6) to elect Defendants Taylor, Luo, Boris, Goldberg, Krzanich, McIntyre, and Peretz to serve as directors.

127.    The Merger Proxy Statement stated the following regarding the Board's and the Audit Committee's risk oversight functions:

> Our Board's oversight of risk is administered directly through our Board, as a whole, or through its audit committee. Various reports and presentations regarding risk management are presented to our Board to identify and manage risk. The audit committee addresses risks that fall within the committee's area of responsibility. For example, the audit committee is responsible for overseeing the quality and objectivity of the Company's financial statements and the independent audit thereof. Management furnishes information regarding risk to our Board as requested.

128.    The Merger Proxy Statement also listed certain responsibilities of the Audit Committee, which at that time consisted of Defendants Berns (as Chair), Goldberg, and Katzman. These responsibilities included: (1) "the appointment, compensation, retention, replacement, and oversight of the work of the independent registered public accounting firm engaged by us;" (2) "pre-approving all audit and permitted non-audit services to be provided by the independent registered public accounting firm engaged by us, and establishing pre-approval policies and procedures;" (3) "obtaining and reviewing a report, at least annually, from the independent registered public accounting firm describing: (i) the independent registered public accounting firm's internal quality-control procedures; (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the audit firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm and any steps taken to deal with such issues and; (iii)

all relationships between the independent registered public accounting firm and us to assess the independent registered public accounting firm's independence;" and (4) "reviewing with management, the independent registered public accounting firm, and our legal advisors, as appropriate, any legal, regulatory or compliance matters, including any correspondence with regulators or government agencies and any employee complaints or published reports that raise material issues regarding our financial statements or accounting policies and any significant changes in accounting standards or rules promulgated by the Financial Accounting Standards Board, the SEC or other regulatory authorities."

129.    The Merger Proxy Statement also stated the following regarding the administration of the Incentive Plan:

> A committee of at least two people appointed by the Board (or, if no such committee has been appointed, the Board) (the "Committee") will administer the Incentive Plan. The Committee will generally have the authority to designate participants, determine the type or types of awards to be granted to a participant, determine the terms and conditions of any agreements evidencing any awards granted under the Incentive Plan, accelerate the vesting or exercisability of, payment for or lapse of restrictions on, awards and to adopt, alter and repeal rules, guidelines and practices relating to the Incentive Plan. The Committee will have full discretion to administer and interpret the Incentive Plan and to make any other determinations and/or take any other action that it deems necessary or desirable for the administration of the Incentive Plan, and any such determinations or actions taken by the Committee shall be final, conclusive and binding upon all persons and entities. The Committee may delegate to one or more officers of the Company or any affiliate the authority to act on behalf of the Committee with respect to any matter, right, obligation or election that is the responsibility of or that is allocated to the Committee in the Incentive Plan and that may be so delegated as a matter of law, except for grants of awards to persons subject to Section 16 of the Exchange Act.

130.    Furthermore, the Proxy Statement included the following financial statements:

## FORUM MERGER III CORPORATION
### CONSOLIDATED BALANCE SHEETS

| | December 31 | |
| --- | --- | --- |
| | 2020 | 2019 |
| | (As Restated) | |
| **ASSETS** | | |
| Current assets | | |
| Cash | $    1,555,497 | $      19,810 |
| Prepaid expenses | 157,486 | — |
| Total Current Assets | 1,712,983 | 19,810 |
| | | |
| Deferred offering costs | — | 62,726 |
| Cash and marketable securities held in Trust Account | 250,066,590 | — |
| **TOTAL ASSETS** | **$ 251,779,573** | **$      82,536** |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities | | |
| Accrued expenses | $    3,329,929 | $        1,966 |
| Accrued offering costs | — | 57,726 |
| Total Current Liabilities | 3,329,929 | 59,692 |
| | | |
| Deferred underwriting fee payable | 8,750,000 | — |
| Warrant liabilities | 29,859,848 | |
| **TOTAL LIABILITIES** | **41,939,777** | **59,692** |
| | | |
| **Commitments and Contingencies** | | |
| | | |
| Class A common stock subject to possible redemption, 20,483,979 and none shares at redemption value as of December 31, 2020 | 204,839,790 | — |
| | | |
| **Stockholders' Equity** | | |
| Preferred stock, $0.0001 par value; 1,000,000 shares authorized, none issued and outstanding | — | — |
| Class A common stock, $0.0001 par value; 100,000,000 shares authorized; 5,257,271 and none issued and outstanding (excluding 20,483,979 and none shares subject to possible redemption) as of December 31, 2020 and 2019, respectively | 526 | — |
| Class B common stock, $0.0001 par value; 10,000,000 shares authorized; 6,250,000 and 7,187,500 shares issued and outstanding as of December 31, 2020 and 2019, respectively[(1)] | 625 | 719 |
| Additional paid-in capital | 34,362,236 | 24,281 |
| Accumulated deficit | (29,363,381) | (2,156) |
| **Total Stockholders' Equity** | **5,000,006** | **22,844** |
| **Total Liabilities and Stockholders' Equity** | **$ 251,779,573** | **$      82,536** |

---

(1)   At December 31, 2019, the shares issued and outstanding includes 937,500 shares of Class B common stock forfeited on October 5, 2020 as a result of the expiration of the underwriter's option to exercise their over-allotment (see Note 6).

## FORUM MERGER III CORPORATION
## CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Stock Subscription Receivable from Stockholder | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Balance – June 25, 2019 | — | $ — | — | $ — | $ — | $ — | $ — | $ — |
| Issuance of Class B common stock to Sponsor[1] | — | — | 7,187,500 | 719 | 24,281 | (25,000) | — | — |
| Collection of stock subscription receivable from stockholder | — | — | — | — | — | 25,000 | — | 25,000 |
| Net loss | — | — | — | — | — | — | (2,156) | (2,156) |
| Balance – December 31, 2019 | — | — | 7,187,500 | 719 | 24,281 | — | (2,156) | 22,844 |
| Sale of 25,000,000 Units, net of underwriting discounts and public warrant liabilities | 25,000,000 | 2,500 | — | — | 231,881,777 | — | — | 231,884,277 |
| Sale of 741,250 Private Placement Units, net of private placement warrant liabilities | 741,250 | 74 | — | — | 7,293,826 | — | — | 7,293,900 |
| Forfeiture of Founder Shares | — | — | (937,500) | (94) | 94 | — | — | — |
| Class A common stock subject to possible redemption | (20,483,979) | (2,048) | — | — | (204,837,742) | — | — | (204,839,790) |
| Net loss | — | — | — | — | — | — | (29,361,225) | (29,361,225) |
| Balance – December 31, 2020 (As Restated) | 5,257,271 | $ 526 | 6,250,000 | $ 625 | $ 34,362,236 | $ — | $(29,363,381) | $ 5,000,006 |

(1) Includes 937,500 shares of Class B common stock forfeited on October 5, 2020 as a result of the expiration of the underwriter's option to exercise their over-allotment (see Note 6).

131. The Merger Proxy Statement was materially misleading because it failed to disclose that: (1) contrary to the Merger Proxy Statement's descriptions of the Board's risk oversight function and the Forum Audit Committee's responsibilities, the Board and Forum's Audit Committee were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the

Board were breaching their fiduciary duties; and (2) the Individual Defendants on the Board at that time who were breaching their fiduciary duties and who would serve on the post-Merger Board were improperly interested in increasing their unjust compensation by seeking shareholder approval of the Incentive Plan.

132.    The Merger Proxy Statement also failed to disclose that: (1) certain of the Company's and ELMI's financial statements were false and unreliable; (2) certain ELMI executives and/or directors had engaged in the Improper Equity Transactions in which they purchased discounted equity without obtaining an independent valuation; and (3) the Company failed to maintain adequate internal controls.

133.    As a result of the material misstatements and omissions contained in the Merger Proxy Statement, Company shareholders, *inter alia*: (1) approved the Merger; (2) reelected Defendants Boris and Goldberg to the Board, who had breached their fiduciary duties to the Company; (3) elected Defendants Luo and Taylor to the Board, who had engaged in the Improper Equity Transactions and who had aided and abetted the breaches of fiduciary duty by the Forum defendants; (4) elected Defendants McIntyre, Peretz, and Krzanich to the Board, who breached their fiduciary duties to the Company; (5) approved the issuance of more than 20% of the Company's issued and outstanding common stock; (6) approved the Company's third amended and restated certificate of incorporation; (7) approved and adopted, on a non-binding advisory basis, certain differences between the Company's former and the third amended and restated certificate of incorporation; and (8) approved the Incentive Plan, allowing the Individual Defendants to receive unjust compensation.

### *August 13, 2021 Form 10-Q*

134.    On August 13, 2021, the Company its quarterly report on Form 10-Q with the SEC

for the period ended June 30, 2021 (the "2Q21 10-Q"), which was the Company's first quarterly report following the consummation of the Merger on June 25, 2021. The 2Q21 10-Q was signed by Defendants Taylor and Li and contained SOX certifications signed by Defendants Taylor and Li attesting to the accuracy of the financial statements contained in the 2Q21 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

135.    The 2Q21 10-Q contained the following financial statements:

**ELECTRIC LAST MILE SOLUTIONS, INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS (in thousands, except par value and share data)**

| | Successor | | | | | Predecessor |
| --- | --- | --- | --- | --- | --- | --- |
| | June 30, 2021 | | December 31, 2020 | | | December 31, 2020 |
| **ASSETS** | (Unaudited) | | | | | |
| Current assets: | | | | | | |
| Cash and cash equivalents | $ | 171,529 | $ | 25,205 | $ | — |
| Restricted cash | | 45,902 | | — | | — |
| Prepaid expenses and other current assets | | 3,809 | | — | | 42 |
| Inventories | | 824 | | — | | — |
| Total current assets | | 222,064 | | 25,205 | | 42 |
| Property, plant and equipment, net | | 191,966 | | — | | 131,908 |
| Intangibles and other assets, net | | 6,802 | | 38 | | — |
| TOTAL ASSETS | $ | 420,832 | $ | 25,243 | $ | 131,950 |
| | | | | | | |
| LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT) | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable | $ | 7,076 | $ | 1,345 | $ | 178 |
| Accrued expenses | | 2,741 | | 5,532 | | 1,233 |
| Current portion of land contract and promissory note | | 66,658 | | — | | — |
| Total current liabilities | | 76,475 | | 6,877 | | 1,411 |
| Convertible promissory notes | | — | | 25,094 | | — |
| Land contract and promissory note obligations, net of current portion | | 42,716 | | — | | — |
| Warrant liabilities | | 19,447 | | — | | — |
| Pension benefit obligation | | 114 | | — | | 109 |
| Other long-term liabilities | | 443 | | — | | — |
| Total liabilities | | 139,195 | | 31,971 | | 1,520 |
| COMMITMENTS AND CONTINGENCIES | | | | | | |
| Predecessor parent's net investment | | — | | — | | 130,430 |
| Preferred stock, $0.0001 par value; 100 million shares authorized; none issued or outstanding. | | — | | — | | — |
| Common stock, $0.0001 par value; 1 billion shares authorized; 124,027,012 issued and 118,777,012 outstanding at June 30, 2021 and 82,117,288 issued and outstanding at December 31, 2020. | | 12 | | 8 | | — |
| Additional paid-in capital | | 301,467 | | 992 | | — |
| Accumulated deficit | | (19,842) | | (7,728) | | — |
| Total shareholders' equity (deficit) | | 281,637 | | (6,728) | | 130,430 |
| TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY | $ | 420,832 | $ | 25,243 | $ | 131,950 |

136.    The 2Q21 Form 10-Q stated the following concerning Defendant Luo's dealings:

On June 23, 2021, an entity controlled by Jason Luo sold 6,097 common shares of ELM back to ELM for the original purchase price of $10.00 per share or a total of $61 thousand, prior to and in connection with the issuance of 5,000,000 shares of the Company's common stock to SERES upon the closing of the Business Combination pursuant to the SERES Asset Purchase Agreement. This transaction was presented in the condensed consolidated statement of changes in shareholders' equity (deficit) retroactively applying the exchange ratio from the Business Combination.

### November 12, 2021 Form 10-Q

137.     On November 12, 2021, the Company its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2021 (the "3Q21 10-Q"). The 3Q21 10-Q was signed by Defendants Taylor and Song and contained SOX certifications signed by Defendants Taylor and Song attesting to the accuracy of the financial statements contained in the 3Q21 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

138.     The 3Q21 10-Q contained the following financial statements:

ELECTRIC LAST MILE SOLUTIONS, INC.
CONDENSED CONSOLIDATED BALANCE SHEETS (in thousands, except par value and share data)

| | Successor | | Predecessor |
|---|---|---|---|
| | September 30, 2021 | December 31, 2020 | December 31, 2020 |
| ASSETS | (Unaudited) | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 143,154 | $ 25,205 | $ — |
| Restricted cash | 27,750 | — | — |
| Accounts receivable | 136 | — | — |
| Prepaid expenses and other current assets | 8,503 | — | 42 |
| Inventories | 7,579 | — | — |
| Total current assets | 187,122 | 25,205 | 42 |
| Property, plant and equipment, net | 192,736 | — | 131,908 |
| Intangibles and other assets, net | 6,124 | 38 | — |
| TOTAL ASSETS | $ 385,982 | $ 25,243 | $ 131,950 |
| | | | |
| LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT) | | | |
| Current liabilities: | | | |
| Accounts payable | $ 7,757 | $ 1,345 | $ 178 |
| Accrued expenses | 10,386 | 5,532 | 1,233 |
| Current portion of land contract and promissory note | 54,286 | — | — |
| Total current liabilities | 72,429 | 6,877 | 1,411 |
| Convertible promissory notes | — | 25,094 | — |
| Land contract and promissory note obligations, net of current portion | 29,800 | — | — |
| Warrant liabilities | 14,243 | — | — |
| Pension benefit obligation | 90 | — | 109 |
| Other long-term liabilities | 451 | — | — |
| Total liabilities | 117,013 | 31,971 | 1,520 |
| COMMITMENTS AND CONTINGENCIES | | | |
| Predecessor parent's net investment | — | — | 130,430 |
| Preferred stock, $0.0001 par value; 100 million shares authorized; none issued or outstanding | — | — | — |
| Common stock, $0.0001 par value; 1 billion shares authorized; 124,027,012 issued and 118,777,012 outstanding at September 30, 2021 and 82,117,288 issued and outstanding at December 31, 2020. | 12 | 8 | — |
| Additional paid-in capital | 306,578 | 992 | — |
| Accumulated deficit | (37,621) | (7,728) | — |
| Total shareholders' equity (deficit) | 268,969 | (6,728) | 130,430 |
| TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY | $ 385,982 | $ 25,243 | $ 131,950 |

139.     The statements contained in ¶¶ 118, 120, 122, 124, 135–36, and 138 were materially false and misleading, and failed to disclose material facts necessary to make the statements not

false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) certain of the Company's and ELMI's financial statements were false and unreliable; (2) certain ELMI executives and/or directors had engaged in the Improper Equity Transactions in which they purchased discounted equity without obtaining an independent valuation; and (3) the Company failed to maintain adequate internal controls. Moreover, during the Relevant Period, the Individual Defendants failed to disclose that the Company had formed the Special Committee on November 25, 2021 to investigate the misconduct. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### **The Truth Emerges**

140.    The truth emerged after markets closed on February 1, 2022, when the Company issued a press release announcing the resignations of Defendants Taylor and Luo and the need to restate certain of the Company's financial statements.

141.    Concerning the resignations of Defendants Taylor and Luo, the press release stated as follows:

> Electric Last Mile Solutions, Inc. (Nasdaq: ELMS; ELMSW) ("ELMS" or "the Company"), a pioneer of electric and intelligent mobility solutions for commercial vehicle customers, today announced that Shauna McIntyre, a member of the Company's Board of Directors, has been appointed as Interim Chief Executive Officer and President, succeeding James Taylor, who has resigned from his role as Chief Executive Officer and a member of the Board. In addition, Brian Krzanich has been appointed Non-Executive Chairman of the Board, replacing Jason Luo, who has also resigned from his position as Executive Chairman of the Board. The departures follow an investigation conducted by a Special Committee of the Board of Directors (the "Special Committee").

142.    The press release also revealed that the Board had formed the Special Committee on November 25, 2021, and it detailed certain findings from the Special Committee's investigation:

> On November 25, 2021, the Company's Board formed an independent Special

Committee to conduct an inquiry into certain sales of equity securities made by and to individuals associated with the Company, the legal, disclosure and tax consequences of those transactions, and other issues that arose in connection those sales. Based on the Special Committee's investigation, the Company has concluded that in November and December 2020, shortly before the Company's December 10, 2020 announcement of a definitive agreement for a business combination with Forum Merger III Corporation, certain Electric Last Mile Inc. executives purchased equity in the Company at substantial discounts to market value without obtaining an independent valuation. Mr. Taylor purchased equity in these transactions. Mr. Luo participated in these and other transactions and directly or indirectly purchased and sold equity in such transactions.

In addition, on January 26, 2022, on the basis of the Special Committee investigation, the Board concluded that the Company's previously issued consolidated financial statements should be restated and, therefore, should no longer be relied upon. The financial statements in question cover the period as of December 31, 2020, the period from August 20, 2020 (inception) through December 31, 2020, the six months ended June 30, and the nine months ended September 30, 2021. In connection with this conclusion, the Company, together with its advisors, is evaluating the accounting and treatment of certain equity issuances to executive officers. Although the Company cannot, at this time, estimate when it will file its restated financial statements for such periods, it is diligently pursuing completion of the restatement, including with respect to an evaluation of the Company's financial statement reserves for tax payments and contingencies.

143.    Also after markets closed on February 1, 2022, the Company filed a Form 8-K with the SEC that provided the following further information concerning the Special Committee's investigation and findings. The February 1, 2022 Form 8-K gave additional detail concerning the Improper Equity Transactions, as follows:

The Company is basing its evaluation on the basis of the following background: In August and September 2020, Mr. Luo founded and funded ELMI by causing ELMI to issue 1,000 shares of common stock to Mr. Luo's entity, AJ Capital, Inc., at $10 per share. Subsequently, on September 18, 2020, Forum, on the one hand, and ELMI and Messrs. Luo and Taylor, on the other hand, executed a letter of intent for a proposed business combination transaction between Forum and ELMI, estimating the total enterprise value ascribed to the combined company at $1.3 billion. At that time, Mr. Luo owned, through AJ Capital, Inc., 100% of the issued shares of ELMI. Thereafter, on November 19, 2020, ELMI issued and sold 99,000 shares of common stock for $990,000 to seven investors (the "November 2020 Equity Transaction"). As described in the Company's S-1 and Proxy Statement, those seven investors included an entity affiliated with Mr. Taylor, called The JET Group,

LLC, which purchased 6,461 shares of ELMI common stock at $10 per share, for a total of $64,610 and two entities affiliated with Mr. Luo, which purchased 78,016 shares of ELMI common stock at $10 per share, for a total of $780,160. Specifically, Luo Pan Investment II, LLC purchased 20,000 shares of ELMI common stock for $200,000, and AJ Capital Investment, LLC purchased 58,016 shares of ELMI common stock for $580,160. In addition, on December 8, 2020, Mr. Luo through AJ Capital, Inc. sold 1,000 shares of ELMI common stock for $10 per share for a total of $10,000 directly or indirectly to other members of senior management (the "December 2020 Equity Transaction").

Prior to the November 2020 Equity Transaction and the December 2020 Equity Transaction, ELMI does not appear to have obtained an independent valuation to determine the fair market value per share of its common stock as of or contemporaneous with the date of those transactions. Because Mr. Taylor may have been seen as providing services to ELMI at the time he participated in the November 2020 Equity Transaction, the Company is evaluating whether ELMI should have treated as compensation to Mr. Taylor any difference between (a) the fair market value of the shares sold by ELMI to The JET Group, LLC and (b) the $10 per share Mr. Taylor paid or caused to be paid. The Company is further evaluating whether a compensation expense should have been recorded and taxes paid in connection with the December 2020 Equity Transaction.

In announcing the Business Combination on December 11, 2020, the Company disclosed an implied equity value for the combined company of approximately $1.4 billion. When the business combination was consummated on June 25, 2021, each ELMI share, for which such executives had paid $10 per share, was exchanged for approximately 800 shares of Electric Last Mile Solutions, Inc.

The Company did not, however, recognize any compensation associated with Mr. Taylor's participation in the November 2020 Equity Transaction, or in connection with the December 2020 Equity Transaction; disclose any compensation associated with those transactions; or withhold or pay taxes in connection with that compensation. Other senior members of management also participated in such transactions in November and December 2020. Furthermore, in connection with the Special Committee investigation, Messrs. Luo and Taylor provided responses to the Special Committee that are believed to be inconsistent with documents reviewed by the Special Committee and its counsel.

144.    In addition, the February 1, 2022 Form 8-K stated that, in connection with a settlement entered into between the Company and Defendant Taylor, Defendant Taylor would surrender 1.8 million shares of the Company's common stock to the Company and, no later than April 11, 2022 additional shares of common stock with a value of approximately $3.3 million.

145.    The February 1, 2022 Form 8-K revealed that the Company would need to restate

its financial statements and that it expected to find that material weaknesses exist in its internal control over financial reporting and that disclosure controls and procedures had been ineffective:

> On January 26, 2022, on the basis of the Special Committee investigation discussed in Item 8.01 below which is incorporated by reference into this Item 4.02, **the Board concluded that the previously issued consolidated financial statements of Electric Last Mile, Inc. as of December 31, 2020 and the period from August 20, 2020 (inception) through December 31, 2020 included in the Company's Registration Statement on Form S-1 (File No. 333-258146) (the "Audited Financial Statements") should be restated and, therefore, should no longer be relied upon. In addition, the Board concluded that the Company's financial statements as of and for the six months ended June 30, 2021 included in its Quarterly Report on Form 10-Q (File No. 001-39357) filed on August 13, 2021 and the Company's financial results as of and for the nine months ended September 30, 2021 included in its Quarterly Report on Form 10-Q (File No. 001-39357) filed on November 12, 2021 should no longer be relied upon** (together with the Audited Financial Statements, the "Non-Reliance Periods").
>
> In connection with this conclusion, the Company, together with its advisors, is evaluating the accounting and treatment of certain equity issuances to executive officers discussed in Item 8.01 of this Current Report on Form 8-K. The Company has engaged legal counsel and an accounting adviser with respect to this matter. Although the Company cannot, at this time, estimate when it will file its restated financial statements for the Non-Reliance Periods, it is diligently pursuing completion of the restatement, including with respect to an evaluation of the Company's financial statement reserves for tax payments and contingencies.
>
> The Company has undertaken an assessment of the accuracy of the Company's historical financial statements and related disclosures that were contained in the aforementioned Registration Statement on Form S-1 and Quarterly Reports on Form 10-Q. **In light of the foregoing, the Company also expects to determine that material weaknesses exist in the Company's internal control over financial reporting and that disclosure controls and procedures were ineffective during the Non-Reliance Period.**

(Emphasis added.)

146.    The February 1, 2022 Form 8-K also stated that, in connection with a settlement entered into between the Company and Defendant Luo, Defendant Luo would promptly surrender 6.0 million shares of the Company's common stock to the Company. In addition, Defendant Luo would pay an additional amount of cash and stock, at his option, totaling $10 million in value.

147.     On this news, the price per share of the Company's common stock fell $2.88 per share from its close price of $5.59 per share on February 1, 2022 to close at $2.71 per share on February 2, 2022, a decline of approximately 51%.

## **Subsequent Developments**

### *February 14, 2022 Form 8-K*

148.     On February 14, 2022 the Company filed a current report on Form 8-K revealing that BDO had resigned as the Company's independent registered public accounting firm had resigned for the fiscal year ended December 31, 2021. In the February 14, 2022 Form 8-K, the Company alleged that an affiliate of BDO helped structure the Improper Equity Transactions, and the Company identified two particular disagreements with BDO; namely, whether BDO complied with applicable auditor independence requirements and whether the Company has taken timely and appropriate remedial action within the meaning of Section 10A of the Exchange Act. Regarding BDO's compliance with applicable auditor independence requirements, the Form 8-K stated as follows:

> *Disagreement over BDO's compliance with the SEC's and PCAOB's auditor independence rules*
>
> As an independent registered public accounting firm, BDO and its associated persons were required by the SEC's and PCAOB's rules to be independent of the Company throughout the audit and professional engagement period. Furthermore, under PCAOB Rule 3526(b), BDO was required to: (i) describe in writing to the Audit Committee all relationships between BDO, BDO's affiliates and the Company that may reasonably be thought to bear on BDO's independence; (ii) discuss with the Audit Committee the potential effects of any such relationships on BDO's independence; (iii) affirm in writing to the Audit Committee that BDO is independent under SEC and PCAOB rules; and (iv) document the substance of its discussion with the Audit Committee.
>
> During the course of its investigation, the Special Committee identified potential concerns regarding BDO's independence. In particular, the Special Committee identified that BDO's Tax Advisory Group ("BDO Tax") had helped to create and structure the Transactions that ultimately resulted in the resignations of ELMI's co-

founder, Jason Luo, who served as Executive Chairman of ELMI and subsequently served as Executive Chairman of the Company until his resignation on February 1, 2022, and of Jim Taylor, our former Chief Executive Officer.

BDO Tax provided advice to Mr. Luo and his affiliates. PCAOB Rule 3522 restricts the ability of an auditor to provide non-audit services to an audit client related to the tax treatment of a "confidential transaction" or a transaction "a significant purpose of which is tax avoidance." Similarly, PCAOB Rule 3523 limits an auditor's provision of tax services to a "person in a financial reporting oversight role at the issuer audit client."

The Special Committee also identified BDO's failure to disclose the BDO Tax engagement in BDO's letter to the Audit Committee dated July 15, 2021, in which BDO purported to list relationships between the Company and BDO and its affiliates that may reasonably be thought to bear on its independence. PCAOB Rule 3526(b) provides that a registered public accounting firm must, at least annually, describe, in writing, to the audit committee of an audit client, all relationships between the firm or any affiliates of the firm and the audit client or persons in financial reporting oversight roles at the audit client, that, as of the date of the communication, may reasonably be thought to bear on independence.

The Company, the Audit Committee and their representatives repeatedly requested that BDO provide its independence analysis with respect to the services provided by BDO Tax. As of the date of this report, BDO has failed to provide the requested information.

149.    Regarding BDO's claims that the Company did not take timely and appropriate remedial action, the Form 8-K stated as follows:

The Company also believes that BDO wrongly claimed that the Company did not take timely and appropriate remedial action with respect to the matters reported in its February 1 Form 8-K.

Exchange Act Section 10A requires an auditor that has detected the possible occurrence of certain "illegal acts" to, among other things, inform management and the audit committee of such acts. In addition, under Section 10A the auditor must notify the board if the company's management and board have not taken "timely and appropriate remedial actions with respect to the illegal act."

On February 8 – the date of its resignation – BDO sent a separate letter addressed to the Board invoking Section 10A and claiming that the Company had not taken such timely and appropriate remedial action. The next day, on February 9, 2022, the Audit Committee sent a letter to BDO responding in detail to BDO's claims. As noted below, this correspondence is attached as exhibits to this filing.

Contrary to BDO's claim that the Company failed to respond adequately to the discovery of the Transactions, it was the Company itself that uncovered the Transactions and brought them to the attention of BDO. The Board formed the Special Committee and caused it to investigate the issues discussed in the February 1 Form 8-K. The Special Committee provided BDO regular updates throughout the investigation process.

BDO's purported claim under Section 10A rings particularly hollow given BDO Tax's role in helping to structure the Transactions – matters which ultimately resulted in the resignation of the Company's former Chief Executive Officer and former Executive Chairman. Indeed, BDO itself had an obligation under Section 10A(a)(2) to include in its audit "procedures designed to identify related party transactions that are material to the financial statements or otherwise require disclosure therein." Given that the Special Committee brought the Transactions to the attention of BDO, and not the other way around, it is not clear how BDO met this requirement.

In sum, the Company believes BDO's claims are directly at odds with the facts of its engagement, BDO's involvement in and contemporary awareness of the underlying transactions, and the regular updates that the Special Committee provided to BDO throughout the investigation process.

### March 3, 2022 Form 8-K

150.     On March 4, 2022, the Company filed a Form 8-K/A with the SEC, attaching as an exhibit a letter of BDO dated March 1, 2022, in which BDO disagreed with certain statements made in the Company's Form 8-K filed on February 14, 2022.

### March 4, 2022 Form 8-K

151.     On March 4, 2022, the Company filed a Form 8-K with the SEC stating, *inter alia*, that the Board approved a planned reduction in force of 50 employees on February 21, 2022. This reduction amounted to approximately 24% of the Company's headcount. The Form 8-K explained that the reduction in force was "part of an overall plan to focus the Company on its core business and streamline its cost structure."

### March 11, 2022 Form 8-K

152.     On March 11, 2022, the Company filed a Form 8-K with the SEC. The Form 8-K revealed that the Company had terminated Defendant Taylor's consulting agreement effective May

10, 2022.

153.    The March 11, 2022 Form 8-K also provided the following update on vehicle status,

disclosing that the Company was conducting a "comprehensive review" of its products under the

guidance of the Company's new leadership:

> On February 14, 2022, Electric Last Mile Solutions, Inc. (the "Company")
> announced in a Current Report on Form 8-K that it was conducting a
> comprehensive review of the status of its products and commercialization plan
> under the guidance of the Company's new leadership. With the assistance of outside
> consultants, management is continuing to assess the Company's planned product
> offerings, production plans, and certification processes, including the feasibility of
> meeting previously announced targets.
>
> The Company currently expects to commence production of certified Urban
> Delivery vehicles no earlier than the end of 2022 and into first quarter of 2023,
> followed by the Urban Utility vehicle no earlier than the first half of 2023. The
> Company had previously disclosed in September 2021 that it had successfully
> launched the ELMS Urban Delivery vehicle, and in November 2021, the Company
> announced that it expected to have certified Urban Delivery vehicles available for
> sale by year-end and that production of its Urban Utility vehicle was expected to
> commence in the second half of 2022. The operational processes planned by the
> Company's new leadership around certification and safety testing, vehicle
> durability testing and other pre-preproduction steps are causing delays in the
> commercialization timeframe for Urban Delivery, Urban Utility and other vehicles.
> Management is committed to working closely with its commercial partners to
> produce quality vehicles that meet appropriate safety standards and will only sell
> vehicles if and when such standards are met.

154.    The Company also announced it was withdrawing all previously issued business

outlook statements, stating as follows, in relevant part:

> ***In connection with management's review, and in light of the disclosures in this
> Item 7.01, the Company has decided to withdraw all previously issued business
> outlook and related forward-looking statements, as well as other
> commercialization targets issued by the Company, until such time as it has
> improved forecasting confidence.*** The statements in this Current Report on Form
> 8-K hereby supersede any previously issued disclosure and guidance from the
> Company with respect to such matters. The Company intends to keep the public
> informed of its progress.

(Emphasis added.)

155.     Furthermore, the March 11, 2022 Form 8-K disclosed that on March 7, 2022, the Company learned that the SEC's Division of Enforcement is conducting an investigation of certain matters discussed in the following: "Current Reports on Form 8-K filed by the Company on September 27, 2021, February 1, 2022 and February 14, 2022 and Exhibits 99.1 and 99.2 to Forum Merger III Corporation's Current Report on Form 8-K filed on March 16, 2021."

### March 15, 2022 Form 8-K/A

156.     On March 15, 2022, the Company filed a Form 8-K/A amending its March 4, 2022 Form 8-K. The March 15, 2022 Form 8-K/A stated that the Company's planned reduction in force, announced on March 4, 2022, would cause the Company to incur net pre-tax charges of approximately $0.3 million in severance and related costs. The planned reduction in force and the associated severance and related costs are evidence of the Forum Defendants' engagement in the Overpayment Misconduct.

### April 1, 2022 Form NT 10-K

157.     On April 1, 2022, on Form NT 10-K, the Company filed a notification of its inability to timely file an annual report for the period ended December 31, 2021. The Form NT 10-K explained that, among other reasons, the Company was unable to timely file its annual report on Form 10-K for the period ended December 31, 2021 because of the results of the Special Committee's investigation and the resignation of BDO. The Form NT 10-K also stated that the Company is "is further evaluating whether it properly disclosed the equity purchases entered into by certain ELMI executives, whether it properly assessed the accounting treatment and compensation expense associated with such purchases, and whether it properly paid and withheld the taxes associated with such purchases."

**DAMAGES TO ELM**

158.    As a direct and proximate result of the Individual Defendants' misconduct, ELM has lost and will continue to lose and expend many millions of dollars.

159.    Such expenditures include, but are not limited to, the fees associated with the SEC investigation and the Securities Class Actions filed against the Company and the Company's former CEO, former Executive Chairman, two former Co-CEOs, former CFO, and current CFO, the SEC investigation and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

160.    Such expenditures also include, but are not limited to, the costs incurred by the Company in restating its previous financial statements.

161.    Such expenditures also include, but are not limited to, the costs of the Special Committee's investigation.

162.    Such expenditures also include costs and fees associated with the ongoing disagreement between the Company and BDO regarding, *inter alia*, BDO's alleged role in the Improper Equity Transactions, whether BDO complied with applicable auditor independence requirements, and whether the Company took timely and appropriate remedial action within the meaning of Section 10A of the Securities Exchange Act.

163.    Such expenditures also include the value for which Forum was made to overpay for acquiring ELMI, which was acquired on terms unreasonable to Forum given the undisclosed truth. Costs and occurrences evidencing Forum's overpayment for ELMI include, but are not limited to: (1) the Improper Equity Transactions; (2) the Special Committee's investigation; (3) the Company's comprehensive review of the status of its products and commercialization plan following revelations of misconduct by ELMI officers and directors; and (4) the reduction in force

of 50 employees to focus the Company on its core business and streamline its cost structure, as well as the costs associated with such reduction.

164.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including unjust compensation paid to the Individual Defendants in connection with the Incentive Plan.

165.    As a direct and proximate result of the Individual Defendants' conduct, ELM has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

166.    Plaintiff brings this action derivatively and for the benefit of ELM to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of ELM, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

167.    ELM is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

168.    Plaintiff is, and has been at all relevant times, a shareholder of ELM. Plaintiff will adequately and fairly represent the interests of ELM in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and

prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

169.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

170.    A pre-suit demand on the Board of ELM is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following five individuals: Defendants McIntyre, Boris, Goldberg, Krzanich, and Peretz (the "Directors"). Plaintiff needs only to allege demand futility as to three of five Directors who are on the Board at the time this action is commenced.

171.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

172.    Demand is excused as to Defendants Boris and Goldberg because each faces, individually and together with the remaining Forum Defendants, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to engage in the Overpayment Misconduct, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

173.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in the foregoing schemes. The fraudulent schemes were intended to make

the Company appear more profitable and attractive to investors. Moreover, the Directors caused the Company to fail to maintain internal controls over financial reporting and to fail to maintain effective disclosure controls and procedures. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

174.   Additional reasons that demand on Defendant McIntyre is futile follow. Defendant McIntyre served as a non-employee director of the Company from the consummation of the Merger until her appointment to the position of Interim CEO on February 1, 2022. Thus, she is a non-independent director. The Company provides Defendant McIntyre with her principal occupation for which she receives handsome compensation, including compensation paid under the Incentive Plan which was amended in part due to the false and misleading statements for which certain of the Individual Defendants are responsible. The false and misleading statements in the Merger Proxy Statement led in part to Defendant McIntyre's election to the Board, a position in connection with which she would later be appointed to the position of Interim CEO of the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant McIntyre breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

175.   Additional reasons that demand on Defendant Boris is futile follow. Defendant Boris served as Co-CEO, CFO, and as a director of Forum from its inception until the Merger, whereupon he stepped down from his roles as Co-CEO and CFO and continued serving as a

director of the Company. As noted in the Company's February 1, 2022 Form 8-K, Defendant Boris does not qualify as independent pursuant to Nasdaq Listing Rule 5605(c)(2)(A)(ii). Defendant Boris receives compensation for his role as a Company director, including compensation paid under the Incentive Plan which was approved by shareholders in part due to the false and misleading statements for which certain of the Individual Defendants are responsible. Defendant Boris is a member of Sponsor and is a managing member of Forum Capital, the managing member of Sponsor. In addition, Defendant Boris signed, and thus personally made, the false and misleading statements contained in the 2020 10-K and the 2020 10-K/A. Moreover, the Merger Proxy Statement was solicited on his behalf and the false and misleading statements contained therein contributed to his reelection to the Board. As Co-CEO and CFO prior to the Merger and as a director throughout the Relevant Period, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Boris is a defendant in the Securities Class Actions. For these reasons, Defendant Boris breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

176.    Additional reasons that demand on Defendant Goldberg is futile follow. Defendant Goldberg served as a director of Forum from its IPO until the Merger, whereupon he began serving as a director of the merged Company. He currently serves as a member of the Audit Committee and the Compensation Committee. He is a member of Sponsor, and he also served as a member of Forum's Audit Committee prior to the Merger. Defendant Goldberg receives compensation for his role as a Company director, including compensation paid under the Incentive Plan which was

approved by shareholders in part due to the false and misleading statements for which certain of the Individual Defendants are responsible. In addition, Defendant Goldberg signed, and thus personally made, the false and misleading statements contained in the 2020 10-K and the 2020 10-K/A. The Merger Proxy Statement was solicited on his behalf and the false and misleading statements contained therein contributed to his election to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he served as a member of Forum's Audit Committee prior to the Merger and, in that capacity, he failed to oversee, *inter alia*, the integrity of Forum's financial statements, Forum's internal control over financial reporting, and the effectiveness of its disclosure controls and procedures, as he was required to do under the Forum Audit Committee Charter. For these reasons, Defendant Goldberg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

177.   Additional reasons that demand on Defendant Krzanich is futile follow. Defendant Krzanich has served as a Company director since the Merger was consummated. He was appointed to serve as Board Chair on February 1, 2022. He also serves as a member of the Nominating and Governance Committee. As a Company director and as Chair of the Board, he receives significant compensation from the Company, including compensation paid under the Incentive Plan which was approved by shareholders in part due to the false and misleading statements for which certain of the Individual Defendants are responsible. The false and misleading statements in the Merger Proxy Statement led in part to Defendant Krzanich's election to the Board. As a trusted Company

director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Krzanich breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

178.    Additional reasons that demand on Defendant Peretz is futile follow. Defendant Peretz has served as a Company director since the consummation of the Merger. He is currently the Chair of both the Audit Committee and the Compensation Committee. As a Company director, he receives significant compensation from the Company, including compensation paid under the Incentive Plan which was approved by shareholders in part due to the false and misleading statements for which certain of the Individual Defendants are responsible. The false and misleading statements in the Merger Proxy Statement led in part to Defendant Peretz's election to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Peretz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

179.    Additional reasons that demand on the Board is futile follow.

180.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Directors Boris and Goldberg are

affiliated with Defendants Kiev, Katzman, Berns, and Nachbor through Forum and its affiliated entities. In particular, these six defendants are all members of Sponsor, which played a leading role in effecting the IPO and the Merger. Additionally, Defendants Kiev, Boris, Berns, and Nachbor all played a role in the merger of Forum Merger II Corporation with Tattooed Chef Inc. (Nasdaq: TTCF). Thus, certain of the Forum Defendants engage in a persistent business of engaging in deSPAC transactions. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

181.   The Audit Committee Defendants, consisting of Defendants Boris, Peretz, Goldberg, and Krzanich, served as members of ELM's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for, *inter alia*, overseeing accounting and financial reporting processes, and reviewing and discussing with management major issues regarding accounting principles and financial statement presentations, as well as major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies. The Audit Committee Defendants failed to adequately oversee the Company's reporting processes, failed to remediate major issues regarding accounting principles, financial statement presentations, and identify or remedy deficiencies with the Company's internal controls, and failed prevent the Company from issuing false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

182.   Demand in this case is further excused because the Directors are beholden to and controlled by Defendant Luo, who is a co-founder and former Executive Chairman of the

Company. Defendant Luo beneficially owned approximately 59.3 million shares of Company common stock as of June 25, 2021, or 47.8%. The Company's February 1, 2022 Form 8-K states that, pursuant to a settlement agreement, Defendant Luo agreed to give up some of his holdings of Company stock, including six million shares of Company stock plus an additional amount cash and stock, at his option, totaling $10 million. However, despite his surrendering a portion of his holdings, Defendant Luo still retains significant holdings, and he continues to serve as a consultant to the Company as part of a two-year consultancy agreement in which he remains a limited observer on the Company's Board. Thus, his substantial holdings and his continued presence on the Board make him a controlling shareholder. Defendant Luo is a primary participant in the Improper Equity Transactions, in which he caused ELMI to sell its shares at substantial discounts to market value. In light of Defendant Luo's continued control of the Company, the Directors cannot impartially consider a demand against Defendant Luo, an interested, primary wrongdoer, as they are dependent on him for their continued employment with the Company and the lucrative compensation that goes with that; this is particularly true of Defendant McIntyre who has recently been appointed Interim CEO. Thus, the Directors are unable to evaluate a demand with disinterest or independence as a result of Defendant Luo's control over them. Indeed, although the Company has terminated the consulting agreement entered into with Defendant Taylor in connection with his resignation, the Company has not yet terminated Defendant Luo's consulting agreement, despite that Defendant Luo's engagement in the Improper Equity Transactions was at least as involved as Defendant Taylor's. Together with the termination of Defendant Taylor's consulting agreement, Defendant Luo's continued employment as a consultant demonstrates that the Board is beholden to Defendant Luo.

183.    The Directors violated the Code of Ethics, Company policy, and the Company's

corporate governance documents by engaging in or permitting the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, violations of the Exchange Act, and failing to report the same. Further in violation of the Code of Ethics and the Company's policies, the Individual Defendants failed to maintain internal controls, failed to maintain the accuracy of Company records and reports, and failed to comply with applicable laws and regulations.

184.    In violation of ELM's Audit Committee Charter, the Audit Committee Defendants conducted little, if any, oversight of ELM's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of ELM's Audit Committee Charter, the Audit Committee Defendants failed to adequately oversee of major issues regarding the Company's accounting principles and financial statement presentations and major issues related to the adequacy of the Company's internal controls, including the Company's internal control over financial reporting and disclosure controls and procedures.

185.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for the Company the damages the Company suffered and will continue to suffer thereby. Moreover, the Directors have failed to seek the full measure of damages to the Company caused

by Defendants Taylor and Luo. According to the Company's February 1, 2022 Form 8-K, Defendant Taylor has agreed to surrender 1.8 million shares of common stock to the Company in addition to a number of shares with a value of approximately $3.3 million. Defendant Luo has agreed to surrender 6.0 million shares of the Company's common stock and will pay an additional amount of cash and stock at his option, totaling $10 million in value. However, these amounts fail to address the unjust enrichment to Defendant Taylor and Luo and the harms suffered to the Company as a result of the misconduct described herein. For instance, shortly before the announcement of the Merger, Defendant Taylor purchased 6,461 shares of ELMI common stock at $10 per share for a total of $64,610. Upon the consummation of the Merger, each share converted into 800 shares of ELM. Ignoring that the price of the Company's common stock was artificially inflated when the Merger was consummated, these shares were worth $2.71, the value at the close of trading on February 2, 2022. Thus, Defendant Taylor gained over $14 million through the Improper Equity Transactions. Defendant Luo purchased 78,016 shares of ELMI common stock at $10 per share for a total of $780,160. Upon the consummation of the merger, these 78,016 shares of ELMI were each convertible to 800 shares of ELM common stock, which were worth $2.71, the closing price on February 2, 2022. Thus, Defendant Luo gained $168.4 million through the Improper Equity Transactions. The settlements with Defendants Taylor and Luo are woefully inadequate to recoup for the Company the compensation paid to Defendants Taylor and Luo. Furthermore, the Directors have not initiated any lawsuit against any of the other wrongdoers who engaged in the Improper Equity Transactions or caused the Company to make false and misleading statements. Thus, any demand upon the Directors would be futile.

186.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and

intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

187.    The acts complained of herein constitute violations of fiduciary duties owed by the Company's officers and directors, and these acts are incapable of ratification.

188.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of the Company. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue the Directors or certain of the officers of the Company, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

189.    If there is no directors' and officers' liability insurance, then the Directors will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

190.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against the Forum Defendants and Defendants Taylor and Luo for Violations of Section 14(a) of the Exchange Act**

191.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

192.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

193.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

194.    Under the direction and watch of the Forum Defendants and Defendants Taylor and Luo,[2] the Merger Proxy Statement failed to disclose, *inter alia*: (1) contrary to the Merger Proxy

---

[2] Plaintiff names Defendant Taylor and Luo in this claim brought under Section 14(a) of the Exchange Act because, as noted in the Company's December 11, 2020 Form 8-K, "ELMI and its

Statement's descriptions of the Board's risk oversight function and the Forum Audit Committee's responsibilities, the Board and Forum's Audit Committee were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties; and (2) the Individual Defendants on the Board at that time who were breaching their fiduciary duties and who would serve on the post-Merger Board were improperly interested in increasing their unjust compensation by seeking shareholder approval of the Incentive Plan.

195.    The Merger Proxy Statement also failed to disclose that: (1) certain of the Company's and ELMI's financial statements were false and unreliable; (2) certain ELMI executives and/or directors had engaged in the Improper Equity Transactions in which they purchased discounted equity without obtaining an independent valuation; and (3) the Company failed to maintain adequate internal controls. As a result, the Merger Proxy Statement was materially false and misleading.

196.    In the exercise of reasonable care, the Forum Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Merger Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Company shareholders in voting on the matters set forth for shareholder determination in the Merger Proxy Statement, which related to the Merger and included but were limited to: (1) approval of the Merger; (2) approval of the issuance of more than 20% of the Company's issued and outstanding common stock in connection with the Merger, including to

---

directors and executive officers may also be deemed to be participants in the solicitation of proxies from the stockholders of Forum in connection with the Business Combination." Thus, Defendant Taylor and Defendant Luo are deemed to be participants in the solicitation of the Merger Proxy Statement.

ELMI securityholders and to SERES; (3) approval of the Company's third amended and restated certificate of incorporation; (4) approval on a non-binding advisory basis certain differences between the Company's second amended and restated certificate of incorporation and the proposed third amended and restated certificate of incorporation; (5) approval of the Incentive Plan; and (6) the election of Defendants Taylor, Luo, Boris, Goldberg, Krzanich, McIntyre, and Peretz to serve as directors of the post-Merger Board.

197.    The false and misleading elements of the Merger Proxy Statement led Forum shareholders to, among other things: (1) approve the Merger, the terms of which were unfavorable to Forum shareholders in light of the Improper Equity Transactions; (2) reelect Defendants Boris and Goldberg to the Board, who had breached their fiduciary duties to the Company; (3) elect Defendants Luo and Taylor to the Board, who had engaged in the Improper Equity Transactions and who had aided and abetted the breaches of fiduciary duty by the Forum defendants; (4) elect Defendants McIntyre, Peretz, and Krzanich to the Board, who breached their fiduciary duties to the Company; (5) approve the issuance of more than 20% of the Company's issued and outstanding common stock; (6) approve the Company's third amended and restated certificate of incorporation; (7) approve and adopt, on a non-binding advisory basis, certain differences between the Company's former and the third amended and restated certificate of incorporation; and (8) approve the Incentive Plan, allowing the Individual Defendants to receive unjust compensation.

198.    The Company was damaged as a result of the Forum Defendants' material misrepresentations and omissions in the Merger Proxy Statement.

199.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

200.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

201.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of the Company's business and affairs.

202.     Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

203.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the Company's rights and interests.

204.     In breach of their fiduciary duties owed to the Company, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) certain of the Company's and ELMI's financial statements were false and unreliable; (2) certain ELMI executives and/or directors had engaged in the Improper Equity Transactions in which they purchased discounted equity without obtaining an independent valuation; (3) the Company had formed the Special Committee on November 25, 2021 to investigate the misconduct; and (4) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

205.     The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

206.     Also in breach of their fiduciary duties, the Individual Defendants caused the

Company to fail to maintain internal controls and effective disclosure controls and procedures.

207.    The Forum Defendants breached their fiduciary duties to the Company by causing Forum to engage in the Overpayment Misconduct by acquiring ELMI on terms that were unfavorable to Forum shareholders in light of undisclosed issues with ELMI.

208.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

209.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

210.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, the Company has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

211.    Plaintiff on behalf of the Company has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Unjust Enrichment

212.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

213.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

214.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance or artificially inflated valuation of the Company, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

215.     This includes the Improper Equity Transactions, in which certain ELMI executives caused ELMI to sell them equity in ELMI at substantial discounts to market value. As a result of the Improper Equity Transactions, certain Individual Defendants, including Defendants Taylor and Luo, converted substantially discounted equity in ELMI into significant holdings New ELM common stock.

216.     This includes compensation received under the Incentive Plan, which certain Individual Defendants induced the Company's shareholders to approve through false and misleading representations.

217.     Plaintiff, as a shareholder and a representative of the Company, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

218.     Plaintiff on behalf of the Company has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Abuse of Control

219.     Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

220.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

221.    As a direct and proximate result of the Individual Defendants' abuse of control, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

222.    Plaintiff on behalf of the Company has no adequate remedy at law.

### FIFTH CLAIM

**Against the Individual Defendants for Gross Mismanagement**

223.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

224.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly-held corporation.

225.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained and will continue to sustain significant damages.

226.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

227.    Plaintiff on behalf of the Company has no adequate remedy at law.

### SIXTH CLAIM

**Against the Individual Defendants for Waste of Corporate Assets**

228.    Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

229.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

230.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused the Company to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

231.    This includes the Special Committee's investigation and the Company's comprehensive review of the status of its products and commercialization plan, which was necessitated in part due to the deceitful misconduct and false and misleading statements issued by the Individual Defendants.

232.    This further includes net pre-tax charges of approximately $0.3 million incurred in connection with a planned reduction in force of 50 employees.

233.    This further includes costs and fees associated with the ongoing disagreement between the Company and BDO.

234.    As a result of the waste of corporate assets, the Individual Defendants and are each liable to the Company.

235.    Plaintiff on behalf of the Company has no adequate remedy at law.

## **SEVENTH CLAIM**

**Against Defendants Taylor, Luo, Boris, Kiev, Li, and Song for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

236.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

237.     The Company and Defendants Taylor, Luo, Boris, Kiev, Li, and Song are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Taylor's, Luo's, Boris', Kiev's, Li's, and Song's willful and/or reckless violations of their obligations as controlling shareholder, officers and/or director of the Company.

238.     Defendants Taylor, Luo, Boris, Kiev, Li, and Song, because of their positions of control and authority as the Company's former CEO, former Executive Chairman, former Co-CEO and CFO, former Co-CEO, former CFO, and current CFO of the Company, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Actions.

239.     Accordingly, Defendants Taylor, Luo, Boris, Kiev, Li, and Song are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

240.     As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Taylor, Luo, Boris, Kiev, Li, and Song.

### EIGHTH CLAIM

**Against the ELMI Defendants for Aiding and Abetting
Breach of Fiduciary Duty**

241.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

242.     The ELMI Defendants aided and abetted the Forum Defendants who breached their

fiduciary duties to the Company.

243.    The ELMI Defendants' misconduct resulted in continuous, connected, and ongoing harm to the Company.

244.    Specifically, the ELMI Defendants promoted the Merger by issuing false and misleading statements concerning ELMI. Moreover, the ELMI Defendants controlled and operated ELMI, the Company's operational predecessor, and caused ELMI to jointly issue financial statements which were incorporated into the Company's SEC filings and which contained materially false and misleading statements promoting the Company's business, operations, and prospects.

245.    Moreover, Defendant Taylor and Defendant Luo, at least, engaged in the Improper Equity Transactions, which caused the Company to create a Special Committee and launch an investigation, and which further contributed to the Company's need to restate previously issued financial statements.

246.    The ELMI Defendants are jointly and severally liable to the same extent as the Forum Defendants are liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

247.    As a direct and proximate result of the ELMI Defendants' aiding and abetting of the Forum Defendants' breaches of duty alleged herein, the Company has sustained and will continue to sustain substantial damages.

248.    Plaintiff on behalf of the Company has no adequate remedy at law

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of ELM, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to the Company;

(c)     Determining and awarding to the Company the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing the Company and the Individual Defendants to take all necessary actions to reform and improve the Company corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of the Company to nominate at least three candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding the Company restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and

proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury.


Dated: April 8, 2022                              Respectfully submitted,


**VIK PAWAR LAW PLLC**

/s/Vik Pawar
Vik Pawar (VP9101)
6 South Street, Suite 201
Morristown, New Jersey 07960
Telephone: (212) 571-0805
Facsimile: (212) 571-0938
Email: vik@pawarlaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*